ALBERT FLEMING, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

WINNIE A. FLEMING, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

LOU B. FLEMING, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CALVIN A. FLEMING, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 3196, 3197, 3202, 3205. Promulgated October 5, 1944.

*John J. Finnorn, Esq.*, for the petitioners.
*Frank B. Schlosser, Esq.*, for the respondent.

**OPINION.**

TURNER, *Judge*: The question common to all petitioners is what gain, if any, was realized by them as stockholders upon the complete liquidation of Fleming Plantation, Inc., in 1940. The law of the case has been very aptly summarized by the United States Circuit Court of Appeals for the Fifth Circuit in *Boudreau* v. *Commissioner*, 134 Fed. (2d) 360, affirming 45 B. T. A. 390, as follows: "Under the express provisions of the applicable statute, when there is complete liquidation of a corporation, stockholders are accountable for the difference between the cost basis of their stock and the fair market value of the property received in exchange for it." Secs. 111, 112 (a), and 115 (c), I. R. C.

The assets of Plantation were distributed in kind and consisted of notes and land on which there were producing oil wells. The respondent determined that the total fair market value of the assets distributed in liquidation by Plantation was $297,818.74. He valued the notes receivable at $9,982; the land, exclusive of minerals, at $25,336.74; and "Minerals (Producing oil and gas leases)" at $262,500. The petitioners make no contention that the notes receivable and the land, exclusive of minerals, were not properly and fairly valued. They argue, however, that as a matter of law no amount in respect of oil and gas is to be included in the value of the corporate assets, the reasoning in part, at least, being to the effect that such value does not represent realized gain, but unrealized appreciation, and that the respondent's determination of fair market value, in so far as it is based on oil and gas in place, is a nullity because based on estimates, assumptions, and speculations. As noted above, the law of the case requires no discussion, for under section 115 (c), *supra*, the exchange by the petitioners of their Plantation stock for the assets of that corporation, in complete liquidation, was a gain-realizing transaction, and under section 111, *supra*, the gain realized was the excess of the fair market value of the Plantation assets (notes and oil-bearing property) over the basis of Plantation stock in the hands of the petitioners, all of which gain is recognizable as taxable gain under section 112 (a), *supra*. There is therefore no merit in the argument that as a matter of law the inclusion in taxable income of the excess of the fair market value of the Plantation assets over the basis of the Plantation stock is a taxing of the petitioners on unrealized appreciation. The question here is one of fact, and, since the parties are agreed on the basis of the Plantation stock, the only item open to dispute is the fair market value of the Plantation assets when received by the petitioners in exchange for their Plantation stock, and in that connection the only apparent question is whether, in arriving at the fair market value of those assets, consideration should be given to oil and gas in place. At the time of the liquidation of Plantation there were several producing oil wells on the land and other wells had been planned or were being drilled. To say, under such circumstances, that the existence of oil on the premises and the prospective production thereof were not elements of value to be considered in arriving at the fair market value of the property distributed by Plantation to its stockholders in liquidation, would be to turn one's back on the realities of the situation. We know of no formula or method whereby fair market value may be determined with mathematical exactness; it requires the exercise of judgment upon the evidentiary facts at hand. The respondent has so exercised his judgment and has arrived at a

value for the assets distributed by Plantation to the petitioners in complete liquidation, and the fact that, in exercising his judgment and in arriving at his conclusion of fair market value, he has seen fit to consider separately the value of the land, exclusive of minerals, and the value of the oil and gas in place, is not an indication that his ultimate determination of value is in error. The petitioners have made no showing that the fair market value of the land, including the oil and gas in place, is different from or less than the total of the amounts shown by the respondent in his determination. Theirs, rather, is a complaint as to the respondent's method of valuation. With respect to the gain realized by the petitioners from the liquidation of Fleming Plantation, Inc., the respondent is accordingly sustained. *Burnet* v. *Logan*, 283 U. S. 404, and *Columbia Oil & Gas Co.* v. *Commissioner*, 118 Fed. (2d) 459, relied upon by the petitioners, are not in point.

In the alternative, it is the claim of the petitioners that the 87 shares of stock of the Louisiana Co. were community property and that one-half thereof, or 43½ shares, were inherited by the children of Calvin Fleming and Georgie Reed Fleming upon the death of the latter, Calvin Fleming, with respect to the said shares, being entitled only to the usufruct, and that under such circumstances the gain realized in respect of the 43½ shares of Plantation stock upon liquidation of that corporation was the gain of the children, not of Calvin Fleming.

Our first inquiry, of course, is whether the shares of the Louisiana Co. were community shares. The petitioners rest their claim that the shares were community shares upon the provisions of articles 2399 to 2402 of the Revised Civil Code of Louisiana. Article 2399 provides that "Every marriage contracted in this State, superinduces of right partnership or community of acquets or gains, if there be no stipulation to the contrary." In article 2401, it is provided that "A marriage, contracted out of this State, between persons who afterwards come here to live, is also subjected to community of acquets, with respect to such property as is acquired after their arrival." In article 2402, it is provided that the partnership or community referred to in preceding articles "consists of the profits of all the effects of which the husband has the administration and enjoyment, either of right or in fact, of all the produce of the reciprocal industry and labor of both husband and wife, and of the estate which they may acquire during the marriage, either by donations made jointly to them both, or by purchase, or in any other similar way, even although the purchase be only in the name of one of the two and not of both, because in that case the period of time when the purchase is made is alone attended to, and not the person who made the purchase. * * * *"

The petitioners point to the fact that the stock of the Louisiana Co. was purchased by Calvin Fleming after he and his wife and their

children had come from Minnesota to Louisiana to live, and argue that under the plain wording of the above articles the stock of the Louisiana Co. still held by Calvin Fleming on the date his wife died was community property. They cite and particularly rely upon the case of *Succession of Dill*, 155 La. 47; 98 So. 752. Dill and his wife had moved from New York, where they were married, to Texas, and later Dill, but not his wife, moved to Louisiana, where he acquired property. It was held that the property so acquired was community property.

The provisions of the Louisiana Civil Code above referred to are very broadly stated, and, standing alone, seem to support the claim of the petitioners here. It is to be noted, however, that no mention is made either by the petitioners on brief, or by the court in the above case, of article 2334 of the code, which reads in part as follows:

> The property of married persons is divided into separate and common property.
> Separate property is that which either party brings into the marriage, or acquired during the marriage with separate funds, or by inheritance, or by donation made to him or her particularly.
> *       *       *       *       *       *       *
> Common property is that which is acquired by the husband and wife during marriage, in any manner different from that above declared.   *   *   *

If, as the petitioners contend, articles 2399 to 2402, *supra*, unqualifiedly provide that all property purchased or acquired "in any other similar way" in Louisiana by either a husband or wife during marriage is community property, we see no escape from the conclusion that those articles are in direct conflict with article 2334. Examination of the decided cases, however, discloses that the articles relied on by the petitioners state a general proposition to which the provisions of article 2334, relating to separate property, provide an exception. See *Succession of Ipser*, 180 La. 656; 157 So. 380; *Smith* v. *Gloyd*, 182 La. 770; 162 So. 617; *Fortier* v. *Barry*, 111 La. 776; 35 So. 900; and *Schwab* v. *Hava*, 154 La. 922; 98 So. 420. Where property has been acquired during marriage, it is incumbent upon a spouse claiming such property as separate property, or one claiming as successor of such spouse, to prove and establish the facts necessary to show that the property is the separate property of such spouse, not community property, and in some instances, at least, it would seem that stricter proof is required of a husband than of a wife. It has been held, for instance, in the case of immovables that even though the particular property has been acquired with the separate funds of the husband, the deed must recite that the property so acquired is acquired as the husband's separate property. *Ramsey* v. *Beck*, 151 La. 190; 91 So. 674. In other cases, it has been held that the property was community property, but a claim against the said property has been allowed to the spouse whose separate property was used in its acquisition. *Kittredge* v. *Grau*,

158 La. 154; 103 So. 723; *Denegre* v. *Denegre*, 30 La. Ann. 275; *Moore* v. *Stancel*, 36 La. Ann. 819; *Durham* v. *Williams*, 32 La. Ann. 162; *Succession of Foreman*, 38 La. Ann. 700.

In the instant case, the cash with which the capital stock of Louisiana was acquired had been earned by Calvin Fleming while a resident of Minnesota and before coming to Louisiana. At the time of his wife's death in 1932, he still owned and held 87 of the 141 shares of Louisiana stock then outstanding. On July 19, 1937, he exchanged his shares of Louisiana stock for the same number and proportion of shares in Fleming Plantation, Inc. The petitioners have stipulated with the respondent that there was no change in the ownership of the shares of Louisiana Co. from the date of the death of Georgie Reed Fleming, wife of Calvin Fleming, on February 28, 1932, to the date of the organization of Fleming Plantation, Inc., and its succession to the Louisiana Co. In 1940, after oil was discovered on the properties held by Fleming Plantation, Inc., that corporation was dissolved and the assets were distributed to the stockholders in proportion to their stockholdings in the corporation. At or about the same time the individuals formerly the stockholders of Plantation joined in a transfer of the properties to a partnership, the interests in which were the same as those previously held in the corporation. The transfers of the assets first by Albert Fleming, as liquidator of Fleming Plantation, Inc., to the stockholders, and then by those individuals to Fleming Plantations, the partnership, were made by formal documents. Those documents were signed by petitioner Calvin Fleming and his four children, the stockholders of Fleming Plantation, Inc., and of Fleming Plantations, the partnership, and were acknowledged before a notary public. In each of those instruments it was recited, without qualification, that Calvin Fleming was the owner of the 87 shares of stock in Fleming Plantation, Inc., and, after liquidation of that corporation, of the same proportionate share of the assets transferred to the partnership.

The conduct of the petitioners and the records made by them support the respondent's contention that the shares of stock in Louisiana Co., having been acquired with the separate property of Calvin Fleming, were established as his separate property and thereafter continued to be his separate property. Any presumption to the contrary which may have arisen at the time the Louisiana stock was purchased is refuted by the facts of record. We accordingly conclude that the alternative contention is without merit.

The remaining issue may be divided into two parts: (1) Whether Calvin Fleming is entitled to a credit of personal exemption as the head of a family and dependency credits for the support of his two grandsons; and (2) whether Albert Fleming is entitled to a personal

exemption as the head of a family and a dependency credit for the support of his mother-in-law.

(1) At the time that Calvin Fleming and his wife took the two grandsons into their home, Calvin was the head of a family. He was not legally obligated to support and maintain his two grandchildren, but he undertook to do so. After the death of his wife, he continued to run his home and to care for the grandsons. At the time the father of the boys remarried it was considered by all to be to the best interest of the boys for them to remain in the home of their grandfather. Calvin Fleming, having assumed the care and support of the grandchildren, was morally obligated to provide for such care and support. The boys were within the relationship required by the statute, and Calvin Fleming is under a moral obligation to perform the duty he has assumed. This meets the statutory requirements, and he is entitled to the personal exemption as the head of a family and to the two dependency credits.

(2) The facts show that Albert Fleming lives in his own household, with his wife, by reason of which he is entitled to the personal exemption provided by statute in the case of a married man living with his wife. The facts do not show that his mother-in-law is dependent upon him for support, nor that he is actually supporting her. Therefore, he is not entitled to such dependency credit.

*Decisions will be entered under Rule 50.*