Miles Production Company v. Commissioner, Ellison Miles v. Commissioner.Miles Production Co. v. CommissionerDocket No. 805-67, 807-67.United States Tax CourtT.C. Memo 1969-274; 1969 Tax Ct. Memo LEXIS 19; 28 T.C.M. (CCH) 1387; T.C.M. (RIA) 69274; December 16, 1969, Filed Wright Matthews, Robert K. Sands, and O. Jan Tyler 2524 Republic Nat'l Bank Bldg., Dallas, Tex., for the petitioners. Ralph V. Bradbury, Jr., for the respondent. DAWSONMemorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following Federal income tax deficiencies and additions to tax against the*22 petitioners: PetitionerTaxable YearDeficiencyAddition to Tax Sec. 6653(a)Miles Production CompanyJune 30, 1961$ 14,747.40$ 737.37Ellison Miles1961126,551.906,327.60196233,672.301,683.62196323,344.051,167.20 1389 Some issues have been settled or conceded by the parties and will be given effect in the Rule 50 computations. Certain other minor issues on which no evidence was offered by petitioners are treated as abandoned. The issues presented for decision are: 1. Is the loss of $259,196.81 sustained by Ellison Miles in 1961 for guarantees and advances to Miller Publishing Company deductible as a business bad debt or as a nonbusiness bad debt? 2. Did Miles Production Company sustain a deductible bad debt loss in the taxable year ended June 30, 1961, on advances of $15,028.11 made to Miller Publishing Company? 3. Is Miles Production Company entitled to claimed deductions for certain attorneys' fees and accountants' fees? 4. Was January 1, 1961, the effective date of assignments of certain oil and gas interests by Ellison Miles to Miles Production Company? 5. Did Ellison Miles receive taxable dividend income*23 in 1961 on the sale of oil and gas properties to Miles Production Company? 6. What was the useful life of certain equipment on the oil and gas properties transferred? 7. Did Miles Production Company correctly compute the cost depletion on the oil and gas properties acquired from Ellison Miles? 8. Are claimed building maintenance expenditures for 1962 and 1963 on rental property deductible as repair expenses or are they nondeductible capital expenditures? 9. Are certain amounts paid to six women in 1961, 1962 and 1963 by Miles Production Company and Ellison Miles deductible business expenses? 10. Is Ellison Miles entitled to certain claimed general expense deductions for the years 1961 and 1963? 11. Is Ellison Miles entitled to certain additional subchapter S corporation losses of Aviation News, Inc., for the years 1961 through 1963? 12. Are petitioners liable for the additions to tax under section 6653(a). 1Findings of Fact Some of the facts are stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. *24 Ellison Miles (herein called Miles) is an individual with his principal office in Dallas, Texas. He was a legal resident of Dallas at the time he filed his petition in this proceeding. His Federal income tax returns for the years 1961, 1962 and 1963 were filed with the district director of internal revenue at Dallas. Miles Production Company (herein sometimes called MPC) is a Texas corporation which during the year ended June 30, 1961, and at the time it filed its petition herein, maintained its principal office in Dallas, Texas. The Federal corporate income tax return of MPC for the fiscal year ended June 30, 1961, was filed with the district director of internal revenue at Dallas. The Federal income tax return for MPC for its fiscal year ended June 30, 1961, showed taxable income of $47,525.32 and an income tax liability of $19,213.17. The Federal income tax return filed by MPC for its fiscal year ended June 30, 1962, showed a net operating loss which was carried back, in part, to the year ended June 30, 1961, and as a result thereof a tentative allowance of $6,589.50 was made. For its fiscal year ended June 30, 1963, MPC filed its Federal income tax return showing a net operating*25 loss and as a result thereof a tentative allowance of $11,807.42 was made. The total amount of refund made of the tax previously paid for the year ended June 30, 1961, was $18,396.92. Miles has spent most of his adult life in the oil and gas business. He received a degree in geology from the University of Houston and since 1946 has been engaged in the oil business, primarily as a drilling contractor and independent producer and operator. Oil and Gas Interests In late 1950 Miles Production Company and Associates brought in a major producing gas well in Wise County, Texas. This well was known as the D. J. Hughes No. 1. Wise and Jack counties are located approximately 70 miles northwest of Dallas, Texas. The successful drilling of this well resulted in the discovery of a major reservoir of 1390 natural gas which is now known as the Boonsville-Atoka Conglomerate Gas Field. This well was drilled by Miles Production Company and Associates. Prior to the drilling of the D. J. Hughes No. 1 well there was little, if any, natural gas production in Jack or Wise Counties, and there was no pipeline in the area to carry a commercial amount of natural gas to the marketing outlet areas. *26 As a result, Miles could not negotiate a profitable gas contract and the well was shut in and did not produce any gas for about three years. Before any pipeline company would construct a pipeline to the natural gas field discovered by Miles, it was necessary for Miles to drill and successfully complete a substantial number of additional gas wells. Lone Star Gas Company offered to purchase the gas from Miles, if and when needed, at 6 cents per MCF. However, it was not economically feasible for Miles to drill the wells, operate them and sell the gas at that price and under those conditions. Miles spent the next 2 years trying to find investors who were willing to provide the financing necessary for the drilling of additional wells in the area. On one of Miles' trips to Houston he met George Mitchell, a former classmate of his in college, who at that time was in the oil and gas business with a group of investors. Miles discussed with Mitchell his findings on the gas reservoir in Jack and Wise Counties. Mitchell was interested and a deal was made whereby Mitchell and his investors would provide a million dollars for the drilling of wells in the North Texas area. Miles was to negotiate*27 for additional oil and gas leases and was assigned a preferential drilling contract on all the wells which provided that so long as he would meet competitive field prices for drilling, he would have the right to drill the wells. By the year 1968 there had been about 1,500 wells drilled in the Boonsville-Atoka Conglomerate Field, of which Miles has drilled over 1,000. As a result of the original arrangement with Mitchell, Miles proceeded to drill approximately 100 to 150 wells, which were shut in. Miles then began negotiations with United Gas Company of Shreveport, Louisiana, with the view toward bringing a pipeline into the area for marketing the natural gas. These negotiations proved unsuccessful and Miles then began negotiating with Natural Gas Pipeline Company of Chicago, Illinois, which already had a pipeline in the Northern Texas Panhandle for supplying natural gas to the Chicago, Illinois, area. Natural Gas Pipeline Company agreed to extend the pipeline to Jack and Wise Counties and further agreed to purchase the natural gas from the wells at 15 cents per MCF provided Miles completed an additional 100 producing wells. Miles and the Mitchell group proceeded to drill the additional*28 100 wells in accordance with the contract with Natural Gas Pipeline Company. However, before any gas was sold, the United States Supreme Court ruled in the case of Phillips Petroleum Company v. Wisconsin, 347 U.S. 672 (1954), that a gas producer selling gas in interstate commerce came under the jurisdiction of the Federal Power Commission. Lone Star Gas Company immediately filed a petition before the Federal Power Commission claiming that the price of gas in the Boonsville-Atoka Conglomerate Field in Wise County, Texas, should be 6 cents, as it had offered, and not 15 cents, as had been offered by Natural Gas Pipeline Company. This matter was before the Federal Power Commission from 1955 until 1957 when the Commission ruled that the price should be 14.9 cents per MCF. In December of 1957, natural gas began to flow from the North Texas area through the pipeline to Chicago. As of 1968, approximately 150 million cubic feet of natural gas a day flowed through the pipeline from the Wise and Jack Counties field to the City of Chicago. During the years 1950 through 1958, Miles conducted his well drilling operations through Trio Drilling Company (herein called Trio), a corporation*29 in which he owned approximately 52 percent of the outstanding stock and of which he was president and general manager, drawing a salary. As a result of the arrangements between Miles and the Mitchell group, Miles d/b/a Miles Production Company acquired royalty and working interests in oil and gas leases in Jack and Wise Counties, Texas. When the natural gas began to move through the pipeline to Chicago, Miles d/b/a Miles Production Company began to receive substantial amounts of income. In 1958, foreign crude oil from the Middle East countries began to be imported into the domestic 1391 market of the United States. The consequence of this imported oil resulted in the domestic oil market being over-supplied. The Railroad Commission of Texas, which controls oil and gas production in the State of Texas, began to cut back the amount of allowable production, and required some wells to be shut down completely. The foreign imported crude oil caused a severe depression in the oil business and resulted in financial failure for many independent oil and gas operators and drilling contractors. Being an independent oil and gas operator, Miles became very concerned about the future course*30 of the domestic oil and gas market as a result of the continuing importation of foreign crude oil. Consequently, he began seeking other business activities for producing income. Losses - Miller Publishing Company Miles was introduced to David John Miller by his longtime personal secretary, Lovetta Carter. Miller was in the printing business with Hal C. Newman under the name of Newman Stationery and Printing Company. Miller had prepared a brochure explaining his printing business and two large printing contracts he had obtained. He had a contract with a major dog food manufacturer on the West Coast to print ten million dog food labels a year and a contract with the Army to print military yearbooks or military food stamp books. Miller presented this information to Miles on the projection that the printing business would generate profits of approximately $500,000 within 2 years of operation. Miller asked Miles to become his partner in the printing business by providing the necessary funds for the operation of the business and his managerial talents. Miller's printing and publishing operation was attractive to Miles for several reasons. He had a number of other business interests*31 which could obtain substantial business from the operation. In 1958, Miles had a 50 percent interest in Universal Printing Ink Corporation located in Houston, Texas, which engaged in the business of manufacturing printer's ink for newspaper and magazine publishers. Universal Printing Ink was a subchapter S corporation and all profits and losses were treated as partnership profits and losses for tax purposes to Miles. Miles contemplated that Universal Printing ink would supply all of the printing ink to the publishing company which would be approximately $25,000 a month when maximum production was reached. In 1958, Miles was a partner in a partnership known as Chemical Solvent Company, located in Dallas, Texas, which manufactured and sold detergents, soaps, janitorial supplies, equipment and various types of cleaning fluids used to clean printing presses. Miles had been a partner in this partnership since 1948 and since the publishing company would be purchasing cleaning fluids for the printing presses, Miles contemplated that Chemical Solvent Company would be supplying the necessary cleaning fluids and janitorial supplies. In addition, Chemical Solvent Company had to have labels*32 printed for its products and since one of the lines of the publishing company's business was going to be the printing of labels, Miles contemplated that the publishing company would obtain additional business from Chemical Solvent Company for the printing of its labels. In 1958, Miles also had a partnership interest in a Chevrolet-Oldsmobile dealership at Graham, Texas, known as Taylor Motor Company. Miles believed that if the publishing company transacted the amount of business projected by Miller, it would be in need of a large fleet of vehicles and trucks for its operations which would be purchased from Taylor Motor Company, thereby generating additional profits for that partnership. In 1958, Miles owned 50 percent of Aviation News, Inc., an aviation magazine published in Dallas for private pilots, airline pilots and other people interested generally in aviation for business or recreation. Aviation News, Inc., was a subchapter S corporation and, therefore, the income and losses of the corporation were treated by Miles on his individual return as partnership income and losses. This corporation was organized in 1957 and it was contemplated that the publishing company would print*33 the Aviation News magazine. The publishing company did, in fact, print the magazine for a few months and the monthly amount of printing was approximately $3,000. Prior to Miles acquiring his interest in Miller Publishing Co., this printing had been done by outside printing companies unrelated to Miles. In 1958, Miles had a 50 percent interest in a general insurance agency in Dallas, Texas, known as Southwestern States General Agency. The insurance agency required a large amount of printing for advertisements, folders and business forms. The agency's printing expense totaled 1392 approximately $50,000 a year. Miles contemplated that the publishing company would obtain, and it, in fact, did obtain all the printing business for Southwestern States General Agency. Miles was interested in Miller's publishing business as a means of eventually supplementing his salary income. He contemplated that he would spend approximately 50 percent of his time with the publishing company and managing and operating the business and in turn draw a salary for his services. He viewed this opportunity as a means of supplementing his income from the oil and gas business which at that time was very*34 depressed and assuring himself of a salary in any event. As an independent oil and gas man, Miles was always seeking to find additional participants for joint ventures in the oil and gas business to obtain leases and drill wells. If Miller's prediction of net profits in 2 years of $500,000 was correct, Miles could see the printing business generating substantial cash funds to invest in oil and gas development with Miles d/b/a Miles Production Company and for the drilling operations of Trio. As a result of the negotiations regarding the publishing and printing business, a contract was executed on December 1, 1958, wherein Miles and Miller agreed to enter the publishing business and such business would be conducted through a Texas corporation known as Miller Publishing Company. Under this agreement, it was agreed that certain assets owned by Newman Stationery and Printing Company would be acquired, which assets were to be used in the business operations of Miller Publishing Company. Miller Publishing Company, Inc., was organized in December 1958 as a Texas corporation. Miles purchased 52 percent of the stock, Miller purchased 40 percent of the stock, and Kenneth Carter, the husband*35 of Miles' personal secretary, purchased 7 percent of the stock. Because of the special equipment needed in Miller Publishing Company's business, it was necessary to construct a new building to house that business. It was decided that the building would be constructed in such a manner so that some of Miles' other business operations could also occupy the premises. In designing and preparing the specifications and plans for the building, a second floor office space was designed for the oil and gas business of Miles d/b/a Miles Production Company and his Trio drilling business. In addition, it was contemplated that Southwestern States General Insurance Agency would also occupy office space in the building. These three businesses, in fact, did move in and occupy office space in the building in addition to other office space which was rented to unrelated tenants. Miller Publishing Company was to have the ground floor for its plant and office space and the second floor was to be occupied by Miles d/b/a Miles Production Company, Trio, Southwestern States General Agency and other tenants. Miles individually handled the negotiations for the acquisition of the land since he personally knew*36 the owners of the land located in an industrial area. Miles discussed the matter with Storey and Les Stemmons, and told them what his plans and projections were, but that due to limited funds it would be necessary for the seller to agree to carry an unsecured note for the land. Miles and Carter organized Carter-Miles Corporation for the purpose of acquiring the land upon which the building was to be constructed. The stock of Carter-Miles was equally owned by Miles and Carter. The land for the site of the construction of the building was purchased by Carter-Miles for a price of $116,430. A promissory note was executed to the seller, Industrial Properties Corporation, in the amount of $110,000. The note was unsecured and was executed by Kenneth J. Carter as president of Carter-Miles Corporation and David John Miller, individually and as co-makers. No vendor's lien or deed of trust was retained by the seller since Carter-Miles could not have obtained interim financing or permanent financing for construction of the building if a lien had been retained. In order for Carter-Miles to build the building for its prospective tenant, Miller Publishing Company, it was necessary to obtain*37 a first mortgage loan commitment. On May 21, 1959, Carter-Miles obtained a loan commitment letter from the Jefferson Standard Life Insurance Company of Greensboro, North Carolina, in the amount of $275,000, which was increased to $350,000 on February 2, 1960. As a condition to granting the loan commitment, Jefferson Standard required the personal 1393 endorsement and guaranty of Miles, K. J. Carter and David John Miller on the loan. Jefferson Standard also required the assignment of satisfactory 15-year leases of Miller Publishing Company, Trio and MPC, having a total annual rent of $70,041. After obtaining the commitment from Jefferson Standard, Miles arranged for interim financing for the construction of the building through the Mercantile National Bank at Dallas, Texas. Miles had been doing buiness with the Mercantile since 1946 and had established a line of credit whereby he as an individual could borrow up to $300,000. Miles normally used this line of credit for the purchase of oil and gas leases and the drilling of oil wells in the development of the gas field in Jack and Wise Counties. These activities were originally conducted as Miles d/b/a Miles Production Company. *38 Miles used approximately $275,000 of this line of credit with Mercantile to obtain the interim financing. As a result of using almost all of his line of credit with the Mercantile National Bank in connection with the construction of the building for Miller Publishing Company, the operations of Miles d/b/a Miles Production Company had to be curtailed or postponed until the project was completed since he did not have the Mercantile line of credit available for his normal oil and gas operations. The interim financing to build the Miller Publishing Company building was supplied Carter-Miles Corporation by the Mercantile National Bank of Dallas. Carter-Miles Corporation entered into a construction contract with A. L. Bateman. Bateman executed a note to the Mercantile National Bank in the amount of $275,000 to obtain the funds with which to build the building. Carter-Miles Corporation executed its promissory note in the sum of $275,000 dated June 26, 1959, to A. L. Bateman, which note was secured by a deed of trust to J. D. Francis, Trustee, on the land upon which the building was to be constructed. Bateman then assigned the promissory note and deed of trust from Carter-Miles Corporation*39 to the Mercantile National Bank as additional security for his $275,000 note to the bank. Thereafter, the Mercantile National Bank advanced sums to Bateman with which to build the building and the building was built at a total cost of $299,701.85. Kenneth J. Carter and Miles individually guaranteed the interim financing by executing a promissory note in the amount of $350,000 to Mercantile National Bank. In order for Miller Publishing Company to commence business operations and make delivery on its military contract and dog food label contract, it was necessary that high-speed printing presses be purchased. These printing presses required a specially designed building to provide for air-conditioned humidity control and for the heavy weight of the presses. It was the responsibility of Miles to obtain the location for the building and to handle all of the financial arrangements for the construction of the building and the purchase of the printing presses and other needed equipment. During the period of time that the building was being constructed and the Mercantile National Bank was providing the interim financing, it became necessary for Miller Publishing Company to start purchasing*40 the equipment and printing presses to be placed in the building so that the equipment and presses would be delivered at the time of completion of the building. The Mercantile National Bank advised Miles that he had reached his loan limit and could not obtain any additional financing from the bank for the purchase of the equipment and presses. Miller then went to the First National Bank of Dallas and presented to them the program of Miller Publishing Company printing contracts already obtained, and Miles' financial statement. The First National Bank initially extended a line of credit in the amount of $125,000 to obtain operating fund amount of $125,000 to obtain operating funds and for funds required as downpayment on the purchase of the printing equipment. The first note was executed on July 31, 1959, in the amount of $125,000 and in connection with this note, Miles, Miller and Carter gave to the First National Bank their personal guarantees for Miller Publishing Company in the amount of $200,000. On June 2, 1960, Miles and Miller gave unlimited personal guarantees to the First National Bank for the indebtedness of Miller Publishing Company. On July 3, 1960, a second promissory note*41 was executed by Miller Publishing Company to the First National Bank in the amount of $100,000. On August 25, 1960, Miles signed personal notes covering the amounts of Miller's indebtedness, so that he could be relieved of his unlimited guarantee. On September 1, 1959, MPC organized and all of the oil and gas operations of Miles d/b/a Miles Production Company were transferred thereto in exchange for all of the stock of MPC. On May 6, 1960, Carter-Miles executed a note and deed of trust to Jefferson 1394 Standard for a first mortgage loan in the amount of $350,000, which sum was used to pay the loans of the Mercantile National Bank for the interim financing. In addition, Carter-Miles assigned to Jefferson Standard a lease dated May 15, 1960, executed by MPC and Trio and a lease dated May 1, 1960, executed Miller Publishing Company. Miles, Miller and Carter individually endorsed the promissory note to Jefferson Standard. The warehouse part of the building where the printing presses were located was completed in the latter part of 1959 and the machinery moved in and set up. The office part of the building was completed in March of 1960, and MPC and Trio became office tenants. *42 Miller Publishing Company commenced operations upon installation of the printing equipment and continued to operate until September 1960. In August 1960, Miles became concerned over the operations and financial condition of Miller Publishing Company. He retained Daniel Ray Rogers to represent MPC and him in connection with their claims against Miller Publishing Company. Rogers had been practicing in Dallas since 1945 in the general civil practice of law, including bankruptcy work and working with oil and gas properties. Rogers made a study of Miller Publishing Company's financial situation. The analysis was made to determine if the business could be rehabilitated, whether it could be sold to someone else, or whether bankruptcy would result. Rogers spent several weeks in conferences and negotiations with prospective purchasers for the business and did consummate a sale of the military book printing contracts which resulted in a substantial savings for the general unsecured creditors of Miller Publishing Company. However, it was learned that the large contract for printing dog food labels was unprofitable and could not be sold. On September 12, 1960, a voluntary bankruptcy petition*43 was filed in the United States District Court in Dallas, Texas. As a result of the bankruptcy, Miles incurred a total loss of $259,196.81 during the calendar year 1961. This loss consisted of the following: ItemAmountLoan to Miller Publishing Company$ 27,000.00Payment to First National Bank in Dallas as endorser of Miller Publishing Company notes248,903.23Payments to Exchange Bank & Trust Co. as endorser of Miller Publishing Company notes7,500.00Total$283,403.23Less: Payments received from Trustee in Bankruptcy24,206.42Amount of loss incurred$259,196.81During its fiscal year ended June 30, 1960, MPC made advances of cash funds to Miller Publishing Company and received repayments from Miller Publishing Company as follows: DateAdvanceRepayment11-24-59$15,000.0012-4-59$15,000.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,000.001-29-605,000.002-9-6015,000.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,000.003-30-60 10,000.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,000.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,000.004-28-608,000.005-3-608,000.005-3-6020,000.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,000.00Promissory notes were issued for some of the advances providing for interest and attorneys' fees*44 in the event of forced collection. MPC collected interest on some of the advances. On July 12, 1960, MPC advanced to Miller Publishing Company an additional $15,000. For its fiscal year ended June 30, 1961, MPC claimed a deduction for bad debt losses of $15,028.11, which figure included $28.11 of telephone expense. Respondent disallowed the deduction in full. MPC claimed on its June 30, 1960, return a bad debt loss of $25,000 by reason of its advances to Miller Publishing Company to June 30, 1960. Miller Publishing Company was adjudicated a bankrupt. On December 22, 1961, MPC received payment in the amount of $3,536.96 from James S. Mahon, Trustee in Bankruptcy for Miller Publishing Company. This payment was the total amount received by MPC with respect to its $40,000 claim. The percentage received by MPC with respect to its $40,000 claim was 8.8424 percent. The amount of recovery attributable to the $15,000 claimed bad debt was $1,338.59 (8.8424 percent of $15,000). The other amounts appearing on the Bad Debt Expense ledger sheet were payments made with respect to the claim in bankruptcy of Carter-Miles Corporation which was merged with MPC on August 21, 1961. 1395 MPC*45 made the advance of $15,000 to Miller Publishing Company on July 12, 1960, in order to provide temporary operating capital funds so Miller Publishing Company could complete a substantial amount of work in process then on hand. Since MPC and Miller Publishing Company were the two largest tenants of the building and since both MPC and Miller Publishing Company had entered into long-term leases on the building which were assigned to the Jefferson Standard, it was to the benefit of MPC to see that Miller Publishing Company continued operations and continued to make rental payments. Rogers, acting as attorney for MPC, filed with the Bankruptcy Court on November 10, 1960, a proof of claim on behalf of MPC for the principal amount of the loan, interest and attorneys' fees. The trustee in bankruptcy allowed MPC's claim for the $40,000 in loans but objected to the claim of interest and attorneys' fees. On June 30, 1961, the referee in bankruptcy allowed MPC's claim for $40,000 upon its agreement to waive interest and attorneys' fees. By letter dated June 13, 1961, Rogers advised Miles that MPC had no reasonable prospect of receiving more than 10 cents per dollar claimed on MPC's claim against*46 Miller Publishing Company. On his Federal income tax return for 1961 Miles claimed a capital loss deduction for a nonbusiness bad debt loss of $259,196.81 on the advances to and guarantees for Miller Publishing Company. Miles never received a salary from Miller Publishing Company during its existence. He was not engaged in the business of making loans to others, making guarantees of loans to corporations or organizing, financing or managing corporations. Legal and Accounting Fees During the fiscal year ended June 30, 1961, MPC made payments to the law firm of Thompson, Knight, Wright & Simmons for services rendered by Rogers as follows: Date of PaymentAmountSeptember 15, 1960$1,500.00November 29, 1960500.00January 6, 1961500.00February 28, 1961500.00April 5, 1961500.00May 2, 1961500.00June 29, 1961500.00Total$4,500.00 These payments represented an initial payment on September 15, 1960, and a monthly retainer for legal services rendered by Rogers to and for the benefit of MPC and Miles. MPC claimed a deduction for these payments as legal fees, which deduction was disallowed by respondent. Once bankruptcy was filed, Rogers*47 represented MPC and Miles in the bankruptcy proceeding and performed all the functions necessary to seure their sharing in the dividends of the bankrupt corporation. In connection with the bankruptcy proceeding of Miller Publishing Company, MPC, in February 1961, made payment of $350 to the firm of Craven & Millican, Certified Public Accountants, for information concerning the financial condition of Miller Publishing Company. Craven & Millican, as accountants for Miller Publishing Company would not release any financial statements to any creditor without payment since they had not been compensated for their services by Miller Publishing Company. MPC claimed a deduction for the $350, which deduction was disallowed by respondent. Assignments (Sales) of Oil and Gas Properties On December 1, 1959, Miles and Trio entered into a farmout agreement covering certain oil and gas leases with Christie, Mitchell & Mitchell Company (herein called CM&M) of Houston, Texas. This farmout agreement (herein referred to as Miles-Trio Farmout) covered six oil and gas leases located in Jack and Wise Counties. The original agreement was amended by letter agreements dated December 11 and December 20, 1959. *48 Under the Miles-Trio Farmout agreement, CM&M agreed to convey to Miles and Trio and undivided 90 percent of the working interest of the oil and gas leases in consideration for Miles and Trio drilling oil and gas wells on the leases. Miles and Trio were to bear the cost of drilling and equipping the wells to the extent of 90 percent of the total cost. CM&M was to bear the remaining 10 percent of the cost. Miles and Trio were to receive 90 percent of the gross production until such time as they had recovered all of their costs of drilling and equipping the wells, interest at the rate of 6 percent on the declining balance of said costs and 90 percent of the operating costs. CM&M was to receive the remaining 10 percent of the gross 1396 production and was liable for 10 percent of the operating costs. After Miles and Trio had recovered all their costs, plus interest, CM&M was then to receive a net profits interest in the leases equal to 80 percent of the net profits. The remaining 20 percent net profits were to be retained by Miles and Trio. By letter agreement dated December 22, 1959, Miles and Trio agreed that the true ownership of the 90 percent working interest conveyed under*49 the Miles-Trio Farmout agreement was as follows: Ellison Miles60 percentTrio Drilling Company10 percentA. L. Payne10 percentJohn Evans10 percentTotal90 percentOn May 18, 1960, CM&M assigned to Miles-Trio the six leases referred to in the farmout agreement. On May 18, 1960, Trio and Miles assigned to John Evans and A. L. Payne their 10 percent out of the 90 percent working interest. On June 3, 1960, Miles acquired an undivided 10 percent of the working interest in the G. Ensley oil, gas and mineral lease. This assignment was subject to a net profits interest retained by the assignor after the assignees had recovered their costs of drilling and equipping wells, with interest at the rate of 6 percent thereon and operating costs. On September 2, 1960, Miles was conveyed an undivided working interest in the H. L. Davis oil and gas lease. Miles was to receive all of the production from his interest until he had recovered his costs of drilling and equipping the wells with interest at the rate of 6 percent thereon and operating costs. Thereafter, the assignor was to have a net profits interest in the lease. Because Miles had guaranteed the indebtedness*50 of Miller Publishing Company to the First National Bank in September 1960 the bank made demand on Miles under his guaranty. Miles, along with his attorney, Rogers, and his CPA and tax advisor, Truxton Shaw, made a study and analysis of Miles' personal assets to determine which ones could be used to satisfy Miles' liability to the First National Bank. After discussion, it was decided that Miles' interest in the Miles-Trio Farmout and his interest in the G. Ensley and H. L. Davis oil and gas leases in Jack and Wise Counties were the most logical assets for Miles to sell to raise the funds. During the months of September and October 1960, discussions and conferences were held between Rogers, Shaw, Miles, and officers of the First National Bank. During these discussions, the First National Bank officers indicated that they would be willing to lend to MPC the sum of $250,000, which MPC would use to pay Miles as purchase price for his interest in the leases. In a conference held in early November 1960, attended by Miles, Rogers and Vance Foster, senior loan officer, and the oil engineer of the First National Bank, the bank officers advised that the oil and gas reserves for Miles' interest*51 in the Miles-Trio Farmout, the G. Ensley and H. L. Davis leases, according to their study, were sufficient to support a loan to MPC of $250,000. At this conference it was agreed that Miles would sell his interest in the oil and gas leases to MPC and that MPC was to borrow from the First National Bank $250,000 which was to be paid to Miles. Rogers was instructed to start the preparation of the necessary documents to conclude the transactions. The effective date of the transaction was to be determined by Shaw. Shaw thought the sale to MPC should be consummated in 1961 and not in 1960 because he was of the opinion that if the gain from the contemplated sale to MPC was realized in 1960 and the loss in Miller Publishing Company sustained in 1961, Miles could not offset the loss against the gain. Shaw was concerned that the paperwork might be delayed for such a time that Miles could not make payment on the guaranty until 1961. Consequently, Shaw advised that the effective date of the transaction should be delayed until 1961 and it was, therefore, decided that the effective date would be January 1, 1961. This decision was reached in November 1960. The valuation report prepared by the*52 Oil Department of the First National Bank as of October 31, 1960, indicated that Miles' interest in the oil and gas leases assigned to MPC had a present worth of $276,615. Shaw, as tax advisor to Miles, advised Miles that the sale to MPC should be made at fair market value or less and that a sales price of $250,000 would be considered at fair market value or less in view of the bank's evaluation of the properties. Shaw advised Miles that if the sale was made to 1397 MPC at an amount in excess of the fair market value of the properties, the excess would be taxed as an ordinary income dividend from MPC to Miles. It was Miles' intent to avoid this result. Although agreement was reached in November 1960, that the transaction would be effective as of January 1, 1961, Rogers could not get the assignment documents and other documents necessary to the transactions prepared prior to March 1961. Because there were so many interests in the properties it was necessary that other documents be executed to clear up Miles' title to the oil and gas leases before he could effectively assign his interest to MPC. It is a customary practice in the oil and gas industry that assignments are executed*53 after the effective date and are made retroactively effective to a prior date. The sales price of $250,000 was determined by Miles, his attorney and his accountant, on the basis of the valuation report supplied by the valuation engineer of the First National Bank, the then-known production of the properties involved and all other factors affecting the value of the leases. Rogers then proceeded to prepare the necessary documents for assignment of Miles' interest in the oil and gas mineral leases to MPC and to arrange for the loan for MPC from the First National Bank. Due to delays in obtaining up-to-date records on the titles of the various interests in the oil and gas leases, the various instruments assigning Miles' interests in the leases to MPC were not executed until after January 1, 1961. However, each assignment document recited therein that it was to be effective as of January 1, 1961, and at all times it was the intent of the parties that the transaction be effective on January 1, 1961. On March 1, 1961, Miles executed an instrument of assignment of his interest in the Miles-Trio Farmout agreement to MPC and said document stated that the assignment was to be effective*54 as of January 1, 1961. The document was filed of record in Wise County, Texas, on March 15, 1961. On March 24, 1961, Miles assigned to MPC all of his undivided 05.94174 percent interest in the working interest of the H. L. Davis oil and gas lease, which instrument stated that the effective date was January 1, 1961. The assignment was recorded in Wise County, Texas, on March 27, 1961. On April 24, 1961, Miles executed an instrument of assignment wherein he assigned to MPC all of his 10 percent interest in the working interest of the G. Ensley lease. Said instrument stated that the assignment was effective as of January 1, 1961. The document was recorded in Wise County, Texas, on July 20, 1961. On April 26, 1961, the First National Bank loaned to MPC the sum of $250,000 on a promissory note which was neither individually endorsed nor individually guaranteed by Miles. MPC paid the sum of $250,000 to Miles as consideration for the assignments of March 1, March 24, and April 24, 1961. The loan by the First National Bank was secured by a deed of trust covering all the interests conveyed by Miles to MPC. Upon receiving the $250,000 from MPC, Miles paid to the First National Bank the*55 sum of $220,767.66 in satisfaction of his indebtedness to the bank on his guaranty of the Miller Publishing Company indebtedness. MPC recorded the purchase of Miles' interests on its accounting records as follows: LeaseDepletable CostDepreciable CostTotal CostH. L. Davis$ 11,719.68$ 1,186.85$ 12,906.53B. Dickenson47,758.578,297.4656,056.03G. Ensley3,535.19650.344,185.53C. A. Lawrence31,649.817,847.1739,496.98D. Patterson20,916.749,308.1030,224.84G. W. Ram- sey54,423.608,000.1962,423.79O. Stewart30,136.7614,569.5444,706.30Totals$200,140.35$49,859.65$250,000.00 All of the equipment was purchased new and Miles' total cost in the equipment was $70,206.98. MPC recorded the cost of the equipment on its books at the same amount as Miles' undepreciated cost of the equipment as of January 1, 1961. As of January 1, 1961, the remaining unpaid balance from the cost of drilling and equipping the wells under the Miles-Trio Farmout was $249,905.16. The amount of payout of Miles' interest as of January 1, 1961, was $166,603.44. As of January 1, 1961, Miles had an unpaid balance in the payout*56 cost of drilling and equipping the G. Ensley well of $10,094.90. As of January 1, 1961, Miles had an unpaid balance in the payout of the cost of drilling and equipping the H. L. Davis well of $6,968.85. 1398 The following schedule shows the amount of production and the dates of receipt of payment for the oil and gas production for the Davis and Ensley leases: Date of ProductionDate of Receipt of PaymentH. L. DavisG. Ensley19608-31-61$2,678.3819609-24-62$3,551.76Jan. 19617-25-61407.42Jan. 19618-31-61758.80Jan. 19619-1-61150.28Feb. 19617-25-61209.85Feb. 19618-31-61446.54Feb. 19619-1-6198.44Mar. 19617-25-61427.08Mar. 19618-31-61567.82Mar. 19619-1-61112.47Apr. 19617-25-61305.78Apr. 19618-31-61451.86Apr. 19619-1-6189.49Feb. 19615-18-6254.29Mar. 19615-18-6278.03Apr. 19615-18-6257.96Jan. 19619-24-621,301.32Total$6,704.21$5,043.36The following schedule shows the amount of production and the dates of receipt of payment for the oil and gas production for the Bessie Dickenson, Stewart and Della Patterson leases: Date of ProductionDate of Receipt of PaymentBessie DickensonStewartDella Patterson19608-31-61$ 3,415.38Nov. 19604-27-62$ 668.2119608-20-622,594.39Jan. 19619-1-611,232.12Jan. 19613-23-613,183.31$ 761.96Feb. 19613-23-61756.56Feb. 19614-21-612,870.83Feb. 19619-1-611,813.37Mar. 19615-24-613,053.23Mar. 19617-25-61916.90Mar. 19619-1-612,394.09Apr. 19617-25-61768.13Apr. 19618-31-612,983.34Apr. 19619-1-61174.40Totals$6,282.19$18,100.48$3,203.55*57 1399 The following schedule shows the amount of production and the dates of receipt of payment for the oil and gas production for the C. A. Lawrence and G. Ramsey leases: Date of ProductionDate of Receipt of PaymentC. A. LawrenceG. RamseyJan. 19618-31-61$ 173.16Jan. 19619-1-61519.49$1,917.18Feb. 19618-31-61118.09Feb. 19619-1-61354.291,226.85Mar. 19618-31-61152.24Mar. 19619-1-61456.7392.12Apr. 19618-31-61118.13Apr. 19619-1-61354.371,552.21Totals$2,246.50All of the proceeds representing payment for oil and gas produced from the leases assigned by Miles to MPC were received by MPC and applied to its indebtedness to the First National Bank. The total amount of the proceeds of $46,368.25 was reported as gross income by MPC on its Federal income tax return for the fiscal year ended June 30, 1961. Respondent determined that payments for all production prior to May 1, 1961, constituted taxable income to Miles and not taxable income to MPC. MPC, in computing its deduction for depletion on the properties assigned by Miles, used the cost method of computing depletion rather*58 than percentage depletion. The deduction was computed on the basis that during the period of payout for drilling and equipping costs, MPC was entitled to receive all of the production after payment of operating expenses and interest at 6 percent on the unpaid balance of the payout. Fair Market Value of Oil and Gas Interests The valuation report prepared by the Oil Department of the First National Bank as of October 31, 1960, showed the present worth of Miles' interest in the Miles-Trio Farmout to be $276,615. Since both Miles and MPC owned interests in the G. Ensley and H. Davis leases, the report evaluated both interests for a total present worth value of $70,582. The report showed a grand total for the interest of Miles and MPC in the Miles-Trio Farmout agreement and in the Davis and Ensley leases of $347,197. The present worth as shown by the bank's report for the interest in the leases assigned to MPC was $288,529. The engineer for the First National Bank who prepared the valuation report had been engaged in various phases of the oil and gas business. His study of the properties involved consisted of obtaining the known production figures and analyzing the electrical logs*59 made of the wells upon completion. His report was made for the purpose of determining the present worth of producing sands for loan purposes only. He was not attempting to determine what a willing buyer and a willing seller would agree upon as a price for the properties. In evaluating oil and gas properties for loan purposes, the bank's evaluation is based on the amount of future production to be obtained from the currently producing sands, an estimate of the amount of operating costs incurred to produce the oil and gas and the estimated length of time necessary to deplete the producing sand. The net profit to be obtained from the producing sand is then time-discounted on the basis of current interest rates to arrive at a present worth of the production. Under this method of evaluation no consideration is given for oil or gas reserves which were bypassed in drilling the hole (known as behind the pipe reserves); undeveloped acreage where additional wells could be drilled; oil and gas reserves which may be below the depth of the present producing sands; salvage rights to the equipment upon abandonment of the well; and whether or not the owner of the interest has the right to be the*60 operator of the working interest or to designate the operator. These considerations are not given any consideration in bank evaluation reports for loan purposes. In addition, for producing gas wells, the bank's evaluation does not consider the value of any production obtainable once the bottom hole pressure reached the minimum pressure level required by the pipeline company, which in this case was 600 pounds. However, additional value is 1400 attributed to the amount of remaining gas reserves in the producing sand, since this gas can be produced and pressurized to pipeline standards and additional production will be obtained. There are willing purchasers of oil and gas properties who will pay 100 percent of present worth value for producing oil and gas leases since it is reasonably assured that the purchaser will recover 100 percent of his investment, plus interest at the prevailing interest rate at the date of purchase. Some purchasers are willing to pay present value for the property, because, in addition to being assured of recovery of their investment plus interest, there may be factors of oil and gas reserves behind the pipe; oil and gas reserves at deeper depths; additional*61 acreage available for drilling of more wells; the right to be the operator of the property and be able to operate the property without additional expense and overhead burden; the right to salvage the equipment upon abandonment of the well, and either sell the equipment or use the equipment on other wells; or merely to obtain the known oil and gas reserves from producing sands for use in integrated oil operations. Based on the bank engineer's estimate of recoverable reserves from producing sands, the wells had estimated production lives of from 5 to 10 years. When each well would cease production, the well would be abandoned and the equipment salvaged and sold. Because of the short life of production for these wells, it could be reasonably anticipated that the equipment would sell for 50 percent to 60 percent of its original cost on salvage. There were six producing gas wells on the leases contained in the Miles-Trio Farmout. The G. Ensley lease had a producing gas well and the H. Davis lease had a producing gas well and a producing oil well. In May 1961, a new well producing both oil and gas was brought in on the Lucas lease which was a part of the unit held by the Davis lease. *62 The Lucas well was a high-producing gas well and was not included in the evaluation report of the bank. The gas wells on all of the leases were 320 acre gas units and the production from these units was holding total acreage of more than 2300 acres. The electrical log readings from the producing gas wells indicated that approximately 1100 acres contained oil reserves from the Strawn sands. The Strawn sand was a well-known oil producing sand in Jack and Wise Counties, In 1961 there were both primary production and secondary recovery production from the Strawn sands. The well spacing for oil wells in the Strawn sand was 40 acres, which meant there was potential acreage available for the drilling of approximately 30 or more oil wells in addition to the then producing gas wells. The electrical logs for the gas wells also indicated low pressure behind the pipe gas reserves. Low pressure reserves are those gas reserves which have a pressure lower than the minimum pipeline pressure, which was 600 pounds. Once all of the gas has been produced from existing reservoirs, additional production can be obtained from the low pressure reservoirs by use of compressors which compress the gas to*63 the minimum pipeline standards. In addition, the operator can use the compressor to produce the residual gas from the current producing reservoir once the pressure drops below the minimum pipeline standard. Based on the electrical log readings and the experience of operators producing gas through compressors, it can be reasonably anticipated that additional gas production equal to one-third of the primary production will be obtained. Oil production could be obtained from the Ellenburger formation at deep levels from current production. The Ellenburger formation is a highly prolific producing formation or reservoir in the Permian Basin in West Texas and was known to extend into Jack and Wise Counties, Texas. At the time of the assignments from Miles to MPC, there was profitable commercial Ellenburger production in an area 10 to 15 miles from the leases assigned. Subsequent to the assignment of the leases involved, Miles purchased some leases for $20 per acre to obtain rights to drill into the Ellenburger formation. Useful Life of Equipment Used on Oil and Gas Properties In his notice of deficiency to Miles respondent determined that depreciation was overstated for the years*64 1961, 1962 and 1963 with respect to oil lease equipment belonging to Miles on 6 lease properties in 1961, 11 lease properties in 1962, and 18 lease properties in 1963. Respondent determined that the useful life of the equipment was 1401 15 years rather than 8 years as claimed on Miles' income tax returns. It is customary in the oil and gas industry that equipment placed on wells is depreciated over the expected life of production from the well or over the expected life of the equipment, whichever is shorter. The production from the wells on the leases transferred by Miles to MPC was at least 10 years. The useful life of the lease equipment was 10 years. In his notice of deficiency to MPC respondent determined that MPC had claimed excessive depreciation on its lease equipment. In its return MPC computed depreciation based on a 10 year life of the equipment, while respondent determined that the lease equipment had a useful life of 15 years. In its petition MPC claimed an 8 year life. The reserves have an estimated life of at least 10 years. The useful life of the lease equipment was 10 years. Expenditures on Maple Avenue Rental Property Miles owns the property located*65 at 2817 Maple Avenue in Dallas, Texas. This property is located in an area of restaurants and at least one club. Miles claimed a deduction for building maintenance and repairs of $1,766.47 for 1962. Respondent disallowed and capitalized $1,749.32 of the claimed deduction. The payments were as follows: DatePayeeAmount12-18-62Joe Hamic Service$ 95.6512-20-62Willie Noble300.0012-21-62Carl Doss Construction Co556.8612-28-62Noble Hauling Service200.0012-31-62Noble Hauling Service241.0012-31-62Carl Doss Construction Co372.96Total$1,766.47 For the taxable year 1963, Miles claimed a deduction for maintenance and repair expenses on the property located at 2817 Maple Avenue in the amount of $3,047.71. Respondent disallowed and capitalized $2,895.60 of the claimed deduction. The payments were as follows: DatePayeeAmount1- 1-63Carl Doss Construction Co$ 288.001- 1-63Arrow Electric Company481.151-18-63Carl Doss Construction Co336.001-23-63Barns Lumber Company395.451-25-63Carl Doss Construction Co240.002- 1-63Carl Doss Construction Co594.273-26-63Arrow Electric Company408.943-26-63Big D. Carbonic151.79Total$2,895.60*66 The repairs were made in December 1962 and January 1963. For a period of approximately six months prior to the repairs being made, the property had been vacant, during which time there had been some vandalism in the building. Miles filed a claim with his insurance company for the vandalism and was paid $701.79, which amount was credited by Miles to repair expenses in 1963. Prior to the claimed repair expenses being incurred, Miles leased the property to the Skyknight Club and agreed to fix up the property for its operation as a club. The club operation was to be on the second floor with the kitchen and dining operations on the lower level, and the third floor was to consist of offices for the Skyknight Club, Miles and others. The Arrow Electric Company did the electric work, including general wiring and installing light fixtures. This work was done to meet the City of Dallas wiring code and to meet the requirements of the new tenant, the Skyknight Club. A new glass lined hot water heater was installed by Joe Hamic Service The property was painted. An adjoining lot was fixed up for parking for the new tenant by Willie Noble and Noble Hauling Service. The Carl Doss Construction*67 Company was paid in part for repairing the vandalism and in part for putting the property in shape for the new tenant. It replaced a bannister, worked on the steps, hung new wallpaper, installed shelving and replaced windows. The Barns Lumber Company and Arrow Electric Company statements to Miles note thereon that the work done by them was in regard to the new tenant, The Skyknight Club. The expenditures on the property located at 2817 Maple Avenue which were disallowed by the respondent added to the value of the building. Amounts Paid to Women by MPC and Miles During the taxable years 1961, 1962 and 1963, MPC made payments to the following women in the stated amounts: 1402 *10 1961Marlene FowlerJune 1, 1961$200.00July 6, 1961200.00August 10, 1961200.00August 29, 1961200.00Total$ 800.00Edna Marie RushingJanuary 30, 1961$100.00April 21, 1961300.00May 18, 1961300.00June 15, 1961200.00July 28, 1961200.00August 21, 1961200.00October 18, 1961200.00November 9, 1961250.00Total$1,750.00Mrs. Sickler (Rubye) GreeneJanuary 30, 1961$150.00February 21, 1961150.00May 23, 1961120.00June 6, 1961150.00June 15, 1961200.00July 7, 1961150.00September 20, 1961200.00Total$1,120.00Linda ScottOctober 13, 1961$200.00October 27, 1961200.00Total$ 400.00Total$4,070.00*68 1403 *10 1962Edna Marie RushingFebruary 13, 1962$200.00March 6, 1962200.00March 21, 1962200.00April 24, 1962250.00June 17, 1962250.00August 31, 1962200.00Total$1,300.00Mrs. Sickler (Rubye) GreeneJanuary 1, 1962$150.00January 8, 1962150.00May 8, 1962200.00May 17, 1962225.00Total$ 725.00Linda ScottDecember 28, 1962$ 100.00Betty L. SimmonsOctober 4, 1962$300.00November 29, 1962150.00Total$ 450.00Total$2,575.00 1404 *10 1963Mrs. Sickler (Rubye) GreeneMarch 7, 1963$200.00June 12, 1963169.00Total$ 369.00Betty L. SimmonsJanuary 17, 1963$300.00February 6, 1963200.00March 13, 1963250.00April 30, 1963300.00May 23, 1963250.00June 25, 1963300.00Total$1,600.00Total$1,969.00 1405 *10 1961Mrs. Sickler GreeneApril 4, 1961$100.00April 14, 1961100.00July 26, 1961200.00August 21, 1961200.00October 18, 1961100.00October 30, 1961100.00November 28, 1961100.00December 19, 1961160.00Total$1,060.00Edna Marie RushingAugust 29, 1961$100.00September 20, 1961200.00November 9, 1961250.00December 12, 1961250.00Total$ 800.00Marlene FowlerJuly 18, 1961$ 200.00Total$2,060.00*69 *10 1962Mrs. Sickler GreeneJanuary 25, 1962$100.00February 13, 1962100.00March 8, 1962250.00March 28, 1962100.00April 10, 1962200.00July 16, 1962200.00August 2, 1962100.00September 21, 1962150.00Total$1,200.00Edna Marie RushingJanuary 8, 1962$150.00February 1, 1962200.00May 8, 1962200.00June 6, 1962250.00June 28, 1962200.00September 28, 1962200.00October 31, 1962200.00December 14, 1962250.00Total$1,650.00Mrs. Betty SimmonsNovember 29, 1962$ 150.00Total$3,000.00 1406 *10 1963Rubye GreeneJanuary 7, 1963$103.12July 25, 1963100.00December 18, 1963200.00Total$ 403.12Edna Marie RushingJanuary 22, 1963$150.00February 25, 1963200.00April 10, 1963200.00May 7, 1963200.00July 16, 1963250.00September 17, 1963200.00November 6, 1963100.00Total$1,300.00Marlene Fowler PeytonMay 11, 1963$200.00May 27, 1963100.00October 8, 1963200.00November 18, 196350.00November 26, 1963100.00Total$ 650.00Betty SimmonsMarch 30, 1963$ 250.00Total$2,603.12*70 1407 These amounts were deducted on the Federal in as general expense. During its fiscal year ended June 30, 1961, MPC made payments to the following women: Edna Marie RushingDecember 16, 1960$200.00January 30, 1961100.00April 21, 1961300.00May 18, 1961300.00June 15, 1961200.00Total$1,100.00Marlene FowlerJune 1, 1961$ 200.00Rubye GreeneJuly 6, 1960$200.00July 19, 1960150.00December 16, 1960100.00December 21, 1960150.00January 30, 1961$150.00February 21, 1961150.00May 23, 1961120.00June 6, 1961150.00June 15, 1961200.00Total$1,370.00Total$2,670.00 1408 January 30, 1961 $150.00February 21, 1961 150.00May 23, 1961 120.00June 6, 1961 150.00June 15, 1961 200.00Total$1,370.00Total$2,670.00 These amounts were deducted on the June 30, 1961, return of MPC as office expense. None of the women billed MPC or Miles for their services in any of the years involved. Miles did not negotiate with any of the women in regard to the amounts the women were paid. No withholding was deducted by MPC or Miles from*71 the amounts paid the women, nor were social security taxes paid on the amounts paid. None of the women were listed on the regular compensation schedule maintained for employees. No Forms 1099 in regard to the amounts paid the women were filed with the Internal Revenue Service by MPC or Miles for any of the years 1961, 1962 or 1963, except for the amounts paid by MPC in 1963 to Betty Simmons, Mrs. Stickler Greene and Marlene Fowler. Miles was not married at any time during 1961, 1962 and 1963. He married Betty Simmons in the fall of 1964. They were divorced in March 1968. During the years 1961, 1962 and 1963 Miles checked into various hotels in the western half of the United States with various women, including Betty Simmons and Marie Rushing, where one room or adjoining rooms were acquired. Many of the hotels were located in vacation or resort areas such as Las Vegas, Nevada; Aspen, Colorado; Newport Beach, California; New Orleans, Louisiana; Galveston, Texas; Lafayette, Louisiana; and Brownsville, Texas. No withholding or social security taxes were deducted by Miles from the amounts paid the women and no social security taxes were paid by him on the amounts paid. The amounts paid*72 the women by Miles were not treated as payroll payments on his records. No record of any kind was kept by Miles as to what services, if any, were rendered by the women, or when or where the alleged services were rendered. In his notice of deficiency to Miles, respondent determined that the aggregate amounts of $4,070, $2,800 and $2,169 paid to the six women in the years 1961, 1962 and 1963, respectively, by MPC constituted dividend income to Miles. It was determined that there was no adequate identification of the business purpose for the allowance to him of amounts paid four women and deducted as general expense in the aggregate amounts of $2,060, $3,000 and $2,603.12 for the taxable years 1961, 1962 and 1963, respectively. In his notice of deficiency to MPC, respondent determined that the aggregate amount of $2,670 paid three women in its taxable year ended June 30, 1961, and claimed by it as a general expense deduction was not allowable because they were made primarily for the nonbusiness benefit of Miles. Claimed General Expense Deductions - Christmas Gifts and Office Petty Cash For several years Miles had a practice of making small incidental cash Christmas gifts to various*73 business associates, such as waiters, parking lot attendants, doormen and shoeshine boys. One year he would make the gifts out of MPC's funds, the next year he would make gifts out of Trio's funds and the third year out of his own funds. A $500 check dated December 19, 1961, was made out by MPC to cash and cashed by Miles. The notation of the voucher for the check reads: "Miscellaneous Christmas Bonuses to part time employees, etc." The record does not reflect the names of the persons who received the money, the amount received by each or the business purpose therefor. Respondent determined in his notice of deficiency to Miles that the $500 constituted dividend income to Miles. In 1963 Miles obtained $250 from his personal checking account for Christmas gifts to business associates. He claimed a deduction for this item as a general business expense which was disallowed by respondent. Miles did not name the recipients, dates or amounts of the gifts or business reason or relationship. The disallowed cash items for 1963 in the aggregate amount of $638 consist of six checks drawn to cash by Miles on checking accounts in his name, as follows: DateAmountNotation on Check5-24-63$100.00Petty Cash5-24-6344.00For account of Rubye Sickler Greene #3-8723 (Stenographic Services)7-16-6344.00For account of Rubye Sickler Greene #3-8723 (Stenographic Services) (Reimburse Car Expense)8- 5-63100.00Office Petty Cash11-13-63100.00Office Petty Cash12-18-63250.00Misc. Xmas Bonus for various associates*74 1409 About $100 to $200 is kept at the office in petty cash from which the secretaries pay postage, delivery boys, general office expenses and supplies. MPC, Trio and Miles alternate in replenishing the fund. No evidence was offered with respect to the two checks for $44 each. Losses - Aviation News, Inc. During the year 1961 Miles owned 50 percent of the stock in Aviation News, Inc. All of the stockholders of Aviation News, Inc., had filed an clection weth respondent to have Aviation News taxed as a partnership rather than as a corporation under the provisions of subchapter S, sections 1371 et seq., Internal Revenue Code of 1954. As of January 1, 1961, Miles had no unrecovered tax basis in loans or advances to or stock of Aviation News. During the year 1961, Miles made advances or loans to Aviation News and purchased stock in the corporation as follows: DateItemAmount3-20-61Purchase of stock$ 800.003-20-61Loan1,700.005- 5-61Loan500.005-29-61Loan153.8312-29-61Loan2,000.00Total$5,153.83For the year 1961, Aviation News sustained a net operating loss of not less than $22,273.26 and*75 Miles' interest therein was not less than $11,136.63. Miles claimed a loss deduction for the year 1961 in the amount of $11,136.63. Respondent disallowed $10,986.57 of the deduction and allowed a deduction of only $152.06. During the calendar year 1961, MPC made cash advances to Aviation News in the amount of $4,500. Respondent determined that the $4,500 advanced by MPC to Aviation News, Inc., constituted constructive dividend income to Miles. It is agreed by the parties that these advances constituted dividend income to Miles and that Miles advanced the funds to Aviation News and thereby constituted additional basis to Miles in loans to Aviation News. It is also agreed by the parties that Miles had a cost basis in loans to, and stock of, Aviation News in the amount of $9,653.83 and that Miles is entitled to a deduction for loss from Aviation News in an amount of $9,653.83, and the correct disallowance is $1,482.80, subject to Miles' proof of additional basis or deduction. For the year 1962, Aviation News, Inc., sustained a net operating loss of $24,265.92 and Miles' interest therein was $11,101.17. Miles claimed a loss deduction for the year 1962 in the amount of $2,517.17. Respondent*76 disallowed $1,317.17 of the deduction and allowed a deduction of only $1,200 which action is correct subject to Miles' proof of additional basis or deduction. For the year 1963, Aviation News, Inc., sustained a net operating loss of $3,524.95 and Miles' interest therein was $1,577.77. Miles claimed a loss deduction for the year 1963 in the amount of $1,577.77. Respondent disallowed the entire amount of the deduction, which action is correct subject to Miles' proof of additional basis or deduction. Section 6653(a) Additions to Tax Miles was negligent in accounting between him and MPC and Trio for payments they made to him and to others for his benefit. MPC and Trio paid to Miles and to others for his benefit substantial amounts of money in each of the years 1961, 1962 and 1963 which were not properly accounted for by Miles. MPC and Trio gave checks for cash to Miles for his personal use, and paid his personal expenditures on credit cards and to social clubs, hotels, airlines, liquor stores, restaurants, bought sporting tickets, paid auto rentals, and paid department stores. Miles claimed on his 1961 income tax return depreciation to June 30, 1961, on certain lease equipment*77 sold to MPC. Miles failed to report on his 1961 return interest income in the amount of $164.29. Miles claimed travel expenses in his 1961, 1962 and 1963 income tax returns which were not deductible for lack of substantiation of the business purpose therefor. Miles failed to report income on his 1961 and 1962 returns in the respective amounts to $280.18 and $566.49 received from Bridgeport Mud Warehouse. Miles did not maintain invoices, vouchers, receipts or other records for all checks written and deducted as expenses. Checks to cash were written by Miles and deducted as travel expense where the only support for the checks was a notation on vouchers that the checks were for travel. Miles' accountant discussed with him the question of eliminating as personal expenditures some portion of the substantial club, meal and entertainment expenses, but Miles decided to deduct all of them. 1410 On November 16, 1960, respondent sent Miles a notice of inadequate records. When no improvements were made, respondent sent a second notice of inadequate records to Miles in 1965. MPC wrote numerous checks to cash and gave them to Miles for his personal use and benefit, and MPC wrote*78 numerous checks to others which were used for the personal benefit of Miles without vouchers or other adequate support or accounting for their deduction by MPC. MPC paid two-thirds of the $300 per month apartment rent of Miles at the Melrose Hotel where he lived. It also paid his parking charges at $25 per month. These were deducted as business expenses by MPC. MPC did not include on its payroll records the amounts paid to Rubye Greene, Edna Marie Rushing and Marlene Fowler. It also did not withhold income tax or deduct social security taxes from the amounts paid to them, and MPC did not pay its share of social security taxes on the amounts paid to them. Ultimate Findings 1. The loss of $259,196.81 sustained by Miles in 1961 on the guarantees and loans to Miller Publishing Company is only deductible as a nonbusiness bad debt. 2. MPC is not entitled to a bad debt deduction of $15,028.11 for the taxable year ended June 30, 1961, by reason of advances made by it to Miller Publishing Company. 3. The amounts of $4,500 paid to the law firm of Thompson, Knight, Wright & Simmons and $350 paid to the accounting firm of Craven and Millican by MPC in its taxable year ended June 30, 1961, constituted*79 ordinary and necessary business expenses of MPC. 4. The effective date of the sale of the lease interests in oil and gas properties by Miles to MPC was January 1, 1961. On that date the fair market value of such lease interests was not less than $250,000. Miles received no taxable dividend from MPC on the sale of such interests. 5. The receipt by MPC after January 1, 1961, of proceeds from the sale of oil and gas production on the properties constituted taxable income to MPC and not taxable income to Miles. 6. The useful life of depreciable lease equipment owned by Miles and MPC during the years in issue was 10 years. 7. MPC is not entitled to a deduction for cost depletion in an amount equal to its cost in the payout. 8. The amounts deducted by Miles in 1962 and 1963 as building maintenance expenses for claimed repairs to the rental property located at 2817 Maple Avenue in Dallas are nondeductible capital expenditures. 9. Payments made by MPC to Kathryn Beggs, Linda Scott, Betty Simmons, Edna Marie Rushing, Marlene Fowler Peyton and Rubye Sickler Greene during the years in issue did not constitute ordinary and necessary business expenses of MPC. Such payments are taxable*80 as dividend income to Miles. Payments made by Miles to these women during the years in issue do not constitute his ordinary and necessary business expenses. 10. Amounts obtained by Miles from MPC for Christmas gifts do not constitute ordinary and necessary business expenses of MPC. Such amounts are taxable as dividend income to Miles. Amounts paid by Miles for use as office petty cash are deductible as ordinary and necessary business expenses. 11. Miles is entitled to deductions in 1961 and 1962 for losses from Aviation News, Inc., in the respective amounts of $9,653.83 and $1,200. Miles is entitled to no deduction in 1963 for a loss from Aviation News, Inc. He is not entitled in 1961, 1962 and 1963 to an additional basis in Aviation News. 12. Miles and MPC are liable for the additions to tax under section 6653(a) because of their negligence and intentional disregard of rules and regulations. Opinion Issue 1. Losses Resulting from Loans and Guaranteed Loans to Miller Publishing Company During 1961 Miles suffered losses with respect to the indebtedness of Miller Publishing Company in amounts totaling $259,196.81. The losses stemmed from guaranty payments to the First National*81 Bank of Dallas and to the Exchange Bank and TrustCompany, and a loan from Miles to Miller Publishing Company. On his 1961 income tax return Miles reported the total amount of the losses as a nonbusines bad debt under section 166(d). Now Miles contends that the amount was either a business bad debt under section 166(a) or a loss incurred in a trade or 1411 business under section 165(a). Respondent's position is that the amount was either a capital loss under section 165(f) or a nonbusiness bad debt under section 166(d). In his brief Miles asserts that it makes no difference whether the amount is a bad debt loss or a capital loss on stock because in either case, if the loss was proximately related to his trade or business, it is fully deductible under section 166(a) or section 165(a). This argument is apparently based to some extent upon our recent opinion in Charles W. Steadman, 50 T.C. 369 (1968), on appeal (C.A. 6). A short review of that case is in order. In the Steadman case the taxpayer was an attorney with stock holdings in a corporate client which provided him with substantial fees. A new stock offering raised the threat that an outsider would shift*82 the corporate legal business to another law firm. The taxpayer bought a large portion of the new shares in order to protect his position as counsel to the corporation. The shares became worthless. The taxpayer contended, and we held, that the shares "were not held as a capital asset." 50 T.C. at 379. Then, because the transaction was "proximately related to his business" the loss was held to be fully deductible under section 165(c)(1). Steadman did not hold his shares as capital assets because he did not intend to make an investment. Instead, he was protecting his income. But this does not mean in every situation where a taxpayer purchases shares in a corporation which is proximately related to his trade or business that the shares are not held as capital assets. Indeed, it is the exceptional case in which securities are not held as capital assets. See Corn Products Refining Co. v. Commissioner, 350 U.S. 46 (1955); Booth Newspapers v. United States, 303 F. 2d 916 (Ct. Cl. 1962); Electrical Fittings Corp., 33 T.C. 1026 (1960); Tulane Hardwood Lumber Co., Inc., 24 T.C. 1146 (1955); Bagley & Sewall Co., 20 T.C. 983 (1953),*83 affd. 221 F. 2d 944 (C.A. 2, 1955); Western Wine & Liquor Co., 18 T.C. 1090 (1952); John J. Grier Company v. United States, 216 F. Supp. 928 (N.D. Ill. 1963), affd. 328 F. 2d 163 (C.A. 7, 1964); Journal Company v. United States, 195 F. Supp. 434 (E.D. Wis. 1961); Smith & Welton, Inc. v. United States, 164 F. Supp. 605 (E.D. Va. 1958). In contrast, the cases involving business bad debts under section 166(a) indicate that the requirement of proximate relationship to a trade or business is more liberal. For example, it is the view of the Court of Appeals for the Second Circuit that a proximate relationship need only be "significant." See Weddle v. Commissioner, 325 F. 2d 849 (C.A. 2, 1963). Use of the words "proximately related" in the Steadman case was intended only to characterize the loss as one sustained in a trade or business under section 165(c)(1). They were not intended to transplant the proximate relationship requirement for bad debts under section 166 into the area of capital and securities losses under section 165. Consequently, Miles is incorrect in his contention that it makes no*84 difference if he held a debt or equity position in Miller Publishing Company. Respondent contends that the loans which Miles guaranteed represented equity rather than debt. The only argument advanced to support this contention is that Miller Publishing Company was thinly capitalized. While a capital contribution of $25,000 against debts of about $280,000 may indicate thin capitalization, it does not establish that the loans were in fact capital contributions. The Court of Appeals for the Fifth Circuit has said that "thin capitalization will not alone justify designated indebtedness as capital." Curry v. United States, 396 F. 2d 630, 634 (c.a./ 5, 1968); Rowan v. United States, 219 F. 2d 51 (C.A. 5, 1955). The fact that two of the loans herein were made largely by banks negates the possibility of other factors, such as failure to pay interest, which might indicate equity instead of debt. See e.g., Berkowitz v. United States, 411 F. 2d 818 (C.A. 5, 1969), listing various factors. According to the stipulation of facts, respondent views the loan by Miles no differently from the guaranteed bank loans. Having determined that the $259,196.81 represents*85 a bad debt loss, it is necessary to decide whether it resulted from "a debt created or acquired in connection with a trade or business of the taxpayer." Section 166 (d)(2)(A). A business bad debt is one which is proximately related to a trade or business of the taxpayer. Section 1.166-5 (b)(2), Income Tax Regs.; Whipple v. Commissioner, 373 U.S. 193 (1963). One who is a mere investor is not engaged in a trade or business. Whipple v. Commissioner, supra. Miles' bad debt was created in the following manner: Miller Publishing Company 1412 needed a building and equipment. CarterMiles Corporation (in which Miles owned 50 percent of the stock) undertook to construct and lease the building. Miles exhausted his line of credit to MPC in order to supply the interim financing for the building. Miller Publishing Company still needed money for equipment and operations, so Miles guaranteed loans made by the banks to it. Miles first argues that he was protecting the line of credit to MPC, his trade or business. If Miles had not guaranteed the loans, Miller Publishing Company could not have begun operations, could not have met its lease*86 obligations, Carter-Miles would not have received long-term financing without the lease, MPC's line of credit would remain tied up in the interim financing, and MPC could not operate effectively without the line of credit. It is not disputed that Miles' activities with MPC constituted a trade or business. Prior to incorporation in September 1959, Miles ran MPC as a proprietorship, and subsequently he remained in full command as its chief executive officer. But we are unable to see how the chain of relationship, from the loan guarantee through the Miller Publishing Company operations, through its lease to Carter-Miles, then through the possible lack of long-term financing, and finally through the line of credit to MPC and its operations, can be characterized as "proximate." Miles next argues that he envisioned Miller Publishing Company becoming a joint venturer with MPC in his oil and gas development activities. Miles expected Miller Publishing Company to be a source of funds for the development activities of MPC. However, Miller Publishing Company and MPC carried on very different businesses; publishing and oil production. In our opinion the mere possibility that in the future they*87 might both put money in the same venture is not the sort of proximate relationship required to establish a business-related debt under section 166(a). Miles further contends that the loans to Miller Publishing Company were proximately related to his other business interests. He testified that Universal Printing Ink would have supplied large quantities of ink to Miller, the Southwest States General Agency had substantial printing needs, and that Miller in fact published Aviation News for a short time. Although these businesses may have been proximately related to Miller Publishing Company, Miles has not shown that they were his trades or businesses. The record discloses only that Miles had a 50 percent stock interest in each of these corporations. "When the only return is that of an investor, the taxpayer has not satisfied his burden of demonstrating that he is engaged in a trade or business * * *." Whipple v. Commissioner, supra at 202; see Deputy v. duPont, 308 U.S. 488 (1940). Miles was also a partner in Chemical Solvent Company and in Taylor Motor Company. He envisioned that Miller Publishing Company would purchase its cleaning supplies and its trucks*88 from these businesses. The speculative nature of these relationships and the absence of proof as to the possible extent of these transactions falls short of demonstrating the necessary proximity. Miles' final argument is that because of hard times with MPC, he needed another source of salary. Under Trent v. Commissioner, 291 F. 2d 699 (C.A. 2, 1961), an employee may be engaged in a trade or business. Miles argues that the loan to Miller Publishing Company was proximately related to establishing a trade or business as a salaried employee of that corporation. We note that in Trent the loan was made as a condition of employment. In Whipple v. Commissioner, supra, the Supreme Court questioned whether a dominant stockholder could prove that his loan was proximately related to maintaining his trade or business as an employee. See also United States v. Worrell,, 398 F. 2d 427 (C.A. 5, 1968); Eugene H. Rietzke, 40 T.C. 443, 450-51 (1963); but see Lundgren v. Commissioner, 376 F. 2d 623 (C.A. 9, 1967). Certainly in most cases a stockholder-employee makes loans to protect his investment rather than his salary. Cases holding that*89 a dominant stockholder made loans to maintain a salary have been limited to taxpayers otherwise unemployable. See and compare Niblock v. Commissioner, - F. 2d - (C.A. 7, Oct. 31, 1969), affirming a Memorandum Opinion of this Court, with Isidor Jaffe, T.C. Memo. 1967-215; and Estate of Kent Avery, T.C. Memo. 1969-64. Miles' several successful ventures indicate that he is highly employable and that he had several salary options. This and the fact that Miles never received any salary from Miller Publishing Company suggest that the loans were not proximately 1413 related to his prospects as an employee, but rather were related to his investment position. In view of the lack of a proximate relationship to any trade or business of Miles, we hold that the loans made directly by him or guaranteed to Miller Publishing Company were not incurred in or created in connection with his trade or business, and therefore the total amount of the losses incurred are deductible only as a nonbusiness bad debt under section 166(d). Issue 2. Loss on Advance by MPC to Miller Publishing Company On July 12, 1960, MPC advanced $15,000 to Miller Publishing Company. This*90 amount remained unpaid on September 12, 1960, when Miller Publishing Company filed its petition in bankruptcy. MPC eventually recovered less than 10 percent of its claim in the bankruptcy proceeding. Respondent contends that the claimed bad debt deduction of $15,028.11 (including telephone expenses) was properly disallowed because MPC had no reasonable expectation of recovery when it advanced the money, and therefore no bona fide indebtedness was created. Section 1.166-1(c), Income Tax Regs. Alternatively, respondent asserts that MPC's deduction should be limited to 90 percent of $15,000. The issue of bona fide indebtedness is one of fact. See John Kelley Co. v. Commissioner, 326 U.S. 521, 530 (1946); American Processing and Sales Co. v. United States, 371 F. 2d 842, 848 (Ct. Cl. 1967); Malone & Hyde, Inc., 49 T.C. 575, 578 (1968); C.M. Gooch Lumber Sales Co., 49 T.C. 649 (1968), remanded for settlement 406 F. 2d 290 (C.A. 6, 1969). Dealings between related corporations "invite close scrutiny." See Kraft Foods Co. v. Commissioner, 232 F. 2d 118, 123 (C.A. 2, 1956). The advance*91 of $15,000 on July 12, 1960, was only one of a series made to Miller Publishing Company. This amount was soon insufficient, and MPC then made the following advances, with subsequent repayments, to Miller Publishing Company. DateAdvanceRepayment11-24-59$15,00012-4-59$15,0001-29-6010,0001-29-605,0002-9-6015,0002-17-6015,0003-30-6010,0003-31-6010,0004-28-6020,0004-28-608,0005-3-608,0005-3-6020,0005-27-6010,000On June 2, 1960, Miles gave the First National Bank of Dallas an unlimited personal guaranty of Miller Publishing Company's indebtedness, and on July 3, 1960, Miller executed another note for $100,000. At some point Miles also advanced $27,000 of his own funds. Notwithstanding the infusion of $100,000 on July 3, 1960, Miller's insatiable cash requirements resulted in the advance of $15,000 by MPC on July 12, 1960. MPC argues, despite this history of Miller's unending cash requirements and short-term borrowings, that it was not until the end of July that it became apparent that the situation was irretrievable. We note, however, that on August 25, 1960, Miles executed personal notes covering*92 the amounts of Miller's indebtedness, so that he could be relieved of his unlimited guaranty. And sometime in late July or early August Rogers was retained to see if anything could be salvaged. MPC claims that the $15,000 enabled Miller Publishing Company to complete work in progress and thereby generate substantial sums of cash. At the time MPC had $25,000 tied up in advances to Miller. If MPC were to recover more than 37.5 cents on the dollar ($15,000/40,000) because of the advance and nothing without it, there would have been some justification for the advance. The actual recovery of 8.8424 cents per dollar fell far short of the mark. We think the mere fact that MPC and Miller Publishing Company rented space in the same building fails to provide a valid and sufficient reason for treating the advance as a bona fide indebtedness. In view of the poor financial condition of Miller Publishing Company at the beginning of July, negating any reasonable expectation of repayment, and the absence of any direct benefit to MPC, we conclude that the $15,000 advance did not represent bona fide indebtedness to MPC. See C.M. Gooch Lumber Sales Co., supra at 656-659. Miles, with*93 claims of $283,403.23 against Miller (seven times the amount of MPC's claims), was in the best position to benefit from the cash generated by the completion of Miller Publishing Company's work in progress. Compare Huntington Rubber Mills v. United States, an unreported case, (D. 1414 Ore. 1959),. The case of W.B. Rushing, 52 T.C. 888 (1969), cited by MPC, is distinguishable. In that case the advance by one of the taxpayer's corporations to another was of "no direct benefit" to the taxpayer, and the advancing corporation had a "significant interest" in the recipient corporation's success. By contrast, we believe MPC would never have advanced the money to Miller Publishing Company "but for" the personal wishes of Miles. MPC had no reason to make the advances to Miller since it owned no stock in that company and did no business with it. But Miles did own 52 percent of Miller's stock, and since the company was undercapitalized Miles was regularly called upon to keep the business going and meet its obligations. He looked everywhere for help. He got it from MPC, his controlled corporation. Accordingly, we hold that MPC is not entitled to a business bad debt deduction*94 in its taxable year ended June 30, 1961, by reason of the $15,028.11 advance to Miller Publishing Company. Issue 3. Legal and Accounting Fees During its taxable year ended June 30, 1961, MPC paid the law firm of Thompson, Knight, Wright & Simmons $4,500 for services rendered by Dan Rogers of that firm. During the same taxable year, MPC paid the accounting firm of Craven & Millican $350 for services rendered. Both amounts were claimed by MPC as a deduction on its income tax return and both deductions were disallowed by respondent. It has been stipulated that the payments were made by MPC and that the payments were for services rendered. The only dispute is whether the services rendered were for the benefit of MPC or Miles individually. Respondent contends that the payments were made primarily for the benefit of Miles. The $4,500 paid to Thompson, Knight, Wright & Simmons represents a total of nine monthly retainer fees of $500 for each of the last nine months of MPC's taxable year ended June 30, 1961. During those months Rogers represented MPC in the Miller Publishing Company bankruptcy proceedings, wherein MPC had a claim against Miller Publishing Company for $40,000. In that*95 connection, Rogers testified that he spent a considerable amount of time analyzing the books and records of Miller Publishing Company in an effort to evaluate its financial condition and to determine whether or not bankruptcy could be avoided. Also, much time and effort were spent by Rogers in an attempt to obtain a purchaser for Miller Publishing Company. When it was finally determined that Miller Publishing Company would be forced into bankruptcy, Rogers filed a claim in the bankruptcy proceedings on behalf of MPC. In addition, the notes MPC held from Miller Publishing Company provided for reasonable attorneys fees of 10 percent of the amount claimed ($40,000). We think the evidence shows that the legal fees represented expenses incurred by MPC in connection with its dealings and operations with Miller Publishing Company. Miles testified that he paid a separate fee for the services of the attorney who represented him with respect to Miller Publishing Company. MPC paid Craven & Millican to examine the records of Miller Publishing Company in order to obtain accurate information as to its finacial condition. The information was used by Rogers in the bankruptcy proceedings. Accordingly, *96 we hold that these payments for legal and accounting fees were ordinary and necessary business expenses of MPC and therefore deductible under section 162(a). Issue 4. Assignments of Oil and Gas Lease Interests by Miles to MPC Respondent originally determined that all income from the leases assigned by Miles to MPC prior to April 26, 1961, was taxable to Miles and not to MPC. Both Miles and MPC contend that all income received after January 1, 1961, was taxable to MPC. In his original brief, respondent modified his position and now contends that the effective date of the transfers should be the date of execution of the assignments. The assignments were executed on March 1, 1961, for the Miles-Trio Farmout interest, on March 24, 1961, for the interest in the H.L. Davis lease, and on April 24, 1961, for the interest in the G. Ensley lease. Each of the assignments specifically provided that the assignment was effective as of January 1, 1961. The resolution of this issue, in turn, affects (1) the determination of who is taxable on the income for oil and gas production prior to May 1, 1961, attributable to these 1415 leases, and (2) the determination of whether the sales price*97 was in excess of the fair market value of the properties transferred to MPC. All of the cash proceeds paid by the pepeline companies after January 1, 1961, were received by MPC, recorded on its accounting records as its income and reported on its Federal income tax return as its taxable income. Respondent determined that all proceeds received from production prior to May 1, 1961, totaling $46,369.25, were taxable to Miles, and not to MPC. Respondent determined that of this total amount, $38,063.29 was taxable to Miles in 1961 and $8,305.96, collected in 1962, was taxable to Miles in that year. Petitioners argue that the income was correctly reported by MPC and that respondent's determination that these amounts were taxable to Miles in 1961 and 1962 was erroneous. The effective date of any transaction is a question of fact to be determined from the intent of the parties. This intent must be gleaned from the statements and acts of all the parties involved in the transaction, as well as the stated intent contained in the documents executed by the parties carrying out the transaction. This intent is controlling absent some legal prohibition to the contrary. Petitioners presented*98 convincing testimony of three witnesses which established that in November 1960 it was agreed and decided that the assignments would be made effective as of January 1, 1961. Respondent produced no testimony or evidence contradicting or conflicting with this evidence. Therefore, we have found that an oral agreement was reached in November 1960 that Miles would assign his interest in the leases to MPC and that the effective date of assignment was to be January 1, 1961. Respondent does not contest the fact that an oral agreement existed, but he argues that the oral agreement was ineffective and not binding on respondent because of the Texas statute of frauds. This argument is not in accord with the Texas authorities. Respondent cites no authority for his argument under the Texas statute of frauds. It is clear that the Texas statute of frauds does not make oral agreements for the transfer of interests in land void or voidable. The statute (Article 3995, Vernon's Annotated Texas Statutes) merely provides a judicial defense to enforcement of the contract. Texas cases hold that an oral contract for the sale of real property is not rendered ilegal or void by the statute of frauds. The statute*99 presupposes a valid agreement. See Brown v. Randolph, 62 S.W. 981 (Tex. Civ. App., 1901); Bringhurst v. Texas Co., 87 S.W. 893 (Tex. Civ. App., 1905); Jackson v. Piper, 28 S.W. 2d 240 (Tex. Civ. App., 1930). The function of the Texas statute of frauds is to suspend judicial enforcement of an otherwise valid agreement until the requirements of the statute have been fulfilled. Leverett v. Leverett, 59 S.W. 2d 252 (Tex. Civ. App., 1933). The fact that the statute is not complied with in an agreement to transfer an interest in real property does not prevent a subsequently executed deed from having a valid inception relating back to the time of the oral agreement. Bishop v. Williams, 223 S.W. 512 (Tex. Civ. App., 1920); Evans v. Ingram, 288 S.W. 494 (Tex. Civ. App., 1926). When these legal principles are applied to the facts of this case, it is clear that the oral agreement reached in November 1960 with respect to the assignment of the interests in the leases from Miles to MPC was a legal and valid agreement when made and once it was reduced to writing it became enforceable as of its effective date, i.e., January 1, 1961. We*100 think respondent's argument that MPC did not obtain effective title to the property until the assignments were executed is without merit and unsupported by Texas law. Respondent's further argument that the statute of frauds is necessary to protect third parties, and that he is a third party here, is also without merit and again in conflict with Texas law. The Texas statute of frauds is a personal defense to the parties to the contract and may not be invoked by a third party. No person who is not a party to the contract can be heard to question its validity. See Franzetti v. Franzetti, 124 S.W. 2d 195 (Tex. Civ. App., 1939); Evans v. Ingram, supra; Jackson v. Piper, supra. Accordingly, we conclude that the payments received from production from January 1, 1961, are taxable to MPC. The intent of the parties and the documents clearly show that MPC was to have and receive full economic benefit from the properties as of January 1, 1961. And this intent was accomplished in fact. MPC received for its own use and benefit all proceeds from the properties subsequent to January 1, 1961. Miles received no cash and did not benefit in any way from the*101 payments to MPC. The legal owner of all production as of January 1, 1961, was MPC and not Miles. It is axiomatic in Federal tax law that income is taxable to the legal owner of the 1416 property producing the income and the legal owner of all the properties herein after January 1, 1961, was MPC. Therefore, respondent's determination that proceeds from the sale of oil and gas production after January 1, 1961, were taxable to Miles and not to MPC is incorrect and unsupported by the evidence contained in this record. Issue 5. Fair Market Value of Oil and Gas Interests Transferred by Miles to MPC - Dividend Income Miles assigned to MPC all of his interest in the Miles-Trio Farmount agreement and the Ensley and Davis mineral leases for a total consideration of $250,000. Miles treated the transaction as the sale of a capital asset and reported a long-term capital gain thereon. MPC treated it as a purchase of oil and gas properties having a total cost of $250,000. Respondent determined that the value of the properties transferred was $179,928.76 and treated the excess as a taxable dividend from MPC to Miles. The question to be resolved is whether Miles received a dividend on*102 the transfer of the properties to MPC. If the fair market value of the properties transferred was at least $250,000, no dividend resulted. The fair market value of the mineral property at a specified date is a factual matter and must be made in the light of the conditions and circumstances known at that date after giving consideration to all factors and evidence having a bearing on the market value. See section 1.611-2(d), Income Tax Regs. In addition to the value of the reserves providing production as of a specified date, several other factors contribute to the value of mineral property, such as: (1) The possibility of secondary recovery for oil production and the recovery of additional gas by compression; (2) the possibility of additional recovery from undeveloped acreage and formations, Albert Fleming, 4 T.C. 168 (1944); (3) the value of salvageable equipment; and (4) whether or not the interest in the property includes the right to operate it, Royal Fuel Co., 8 B.T.A. 741 (1927). In his attempt to ascertain the fair market value of the properties involved, respondent's engineer-agent used what is known as the "analytical*103 appraisal method of valuation." Under this method the appraiser calculates the future gross production and subtracts therefrom the estimated cost of operation, thereby arriving at a net profit. Respondent's regulations provide that if fair market value is to be ascertained as of a certain date, the analytical appraisal method of valuation cannot be used if "the fair market value can reasonably be determined by any other method." Section 1.611-2(d) (2)(ii), Income Tax Regs. On this record we do not find the agent's valuation accurate or reliable. In our opinion petitioner's evidence supports a valuation of $250,000 when production is considered along with other factors, i.e., (1)the salvage value of the equipment, (2)the right of Miles-Trio to operate the properties or to designate the operator, (3) the additional acreage available for drilling, (4) the completion of an additional high producing gas well, (5) additional low pressure gas reserves behind the pipes, (6) additional production of gas from current producing sands through the use of compressors, and (7) deep hole rights under the leases for obtaining Ellenburger production. It is important to*104 consider the circumstances surrounding the sale of these properties to MPC. Miles needed to dispose of some of his assets to raise cash for payment to the First National Bank on his guaranty of the indebtedness of Miller Publishing Company, which was approximately $220,000. Miles, working with his tax advisor and accountant, made a thorough analysis of his financial situation and discussed the pros and cons of what assets could be sold in order to raise the funds. It was decided that Miles' interests in these oil and gas properties constituted his most disposable assets. Although other potential purchasers were available, it was decided that MPC would purchase these properties and operate them in connection with its other oil and gas operations. Because the purchaser would be Miles' wholly owned corporation, Miles was advised by his accountant of the adverse tax consequences if the sale was made to MPC at a price in excess of the fair market value of the properties. This advice was considered by Miles and, based upon the facts known at that time and his knowledge of the gas fields in Jack and Wise Counties which he had been developing for 10 years, Miles determined the minimum value*105 of the properties to be $250,000. This is not a case of an individual taxpayer selling properties to a wholly owned corporation at an arbitrary price and then seeking to justify that price when subsequently 1417 challenged by the Internal Revenue Service. This is a situation where an individual taxpayer, after being advised not to sell the properties for a price in excess of fair market value, determined the minimum value of the properties and, after having that value confirmed by the independent valuation report of the first National Bank, sold them for that price. Miles took every precaution to prevent a dividend. The evidence is persuasive that the transaction was not in purpose or effect a distribution of corporate earnings to a shareholder. See Palmer v. Commissioner, 302 U.S. 63 (1937). There is no evidence that Miles ever intended to obtain a distribution of profits from MPC without paying the appropriate tax on the dividend. To the contrary, the evidence is uncontradicted that the opposite result was intended. Consequently, we will give full effect to Miles' intent and his attempt to carry out this transaction in accordance with that intent. We are not*106 inclined to substitute our business judgment for his. Cf. Sterling Distributors, Inc. v. United States, 313 F. 2d 803 (C.A. 5, 1963). The transaction here involved is not one of an actual distribution of cash without consideration by MPC to Miles because of his stock ownership, nor is it the payment by MPC of an expense or obligation of Miles. Section 301 provides that a taxable corporate dividend results to a stockholder when a distribution of property is made by a corporation to a shareholder with respect to its stock. Section 1.301-1(c), Income Tax Regs., provides: Section 301 is not applicable to an amount paid by a corporation to a shareholder unless the amount is paid to the shareholder in his capacity as such. This regulation covers the many payments made by corporations to persons who are stockholders for services or goods which are not taxable as dividends. See A. A. Emmerson, 44 T.C. 86 (1965). But the transaction here under scrutiny involves one of a vendor, Miles, and a vendee, MPC. That was the primary position of the parties and the fact that a stockholder-corporation relationship existed was merely incidental. *107 In Palmer v. Commissioner, supra, the Supreme Court said: But, the bare fact that a transaction, on its face a sale, has resulted in a distribution of some of the corporate assets to stockholders, gives rise to no inference that the distribution is a dividend within the meaning of section 115. To transfer it from the one category to the other, it is at least necessary to make some showing that the transaction is in purpose or effect used as an implement for the distribution of corporate earnings to stockholders. For there to be a distribution of property by a corporation taxable as a dividend to the shareholder, there must have been a diminution of the corporation's net worth as a result of the distribution. Timberlake v. Commissioner, 132 F. 2d 259 (C.A. 4, 1942). A taxable dividend to a shareholder requires the distribution of property by the corporation without receiving equal consideration. Consequently, if the corporation receives consideration equal to or greater than the value of the property distributed, there has been no diminution of corporate net worth and, accordingly, there has been no taxable dividend to the shareholder. Palmer v. Commissioner, supra;*108 and Robert Lehman, 25 T.C. 629 (1955). Here we have a situation where the corporation purchases from its sole stockholder assets which consisted of a bundle of property rights. The factual issue is whether the bundle of property rights received by the corporation was equal in value to the consideration paid by the corporation for the property. Under the circumstances we hold that MPC received assets of equal value to the consideration paid by it for the properties. Therefore, there was no distribution of profits for the benefit of Miles and thus no dividend taxable to him. We sustain petitioner Miles on this issue. Issue 6. Useful Life of Lease Equipment The parties agree as to the cost of the equipment and on the use of the declining balance method of computing the depreciation. The only issue, a factual one, relates to the length of the useful life of the equipment. Respondent contends that the useful life for computing depreciation on the well equipment on the leases assigned by Miles to MPC was 15 years. Petitioners contend that the useful life of the equipment for depreciation purposes was 8 years. We do not agree with either. Based on the evidence in this*109 record, it is our view that the lease equipment had a useful life of 10 years. Our findings of fact reflect this conclusion. 1418 Issue 7. Allowable Cost Depletion In his notice of deficiency to MPC, respondent determined that MPC had claimed excessive cost depletion of $20,010 from oil and gas leases for its fiscal year ended June 30, 1961. MPC recorded in its books the acquisition of the leases acquired from Miles for $250,000, consisting of claimed depletable cost of $200,140.35 and depreciable cost of $49,859.65, as set forth in our findings of fact. Consistent with his determination that the fair market value of the lease properties transferred by Miles to MPC was $179,928.76, respondent accepted the $49,859.65 cost allocated by MPC to the depreciable equipment and determined that depletable cost was $130,069.11 ($179,928.76 minus $49,859.65) rather than the $200,140.35 claimed by MPC. Computing claimed cost depletion on each of the leases separately, MPC divided the dollar amount of the expected recovery from the lease into the cost of the lease to obtain a percentage called the depletion factor which it multiplied times the gross income received from the lease in*110 the taxable year, to obtain the amount of depletion claimed on that lease. We have previously concluded that the fair market value of the oil and gas interests sold by Miles to MPC was $250,000 rather than $179,928.76, as determined by respondent. Therefore, MPC correctly used a depletable cost of $200,140.35. The only issue we must resolve herein is the amount of MPC's allowable deduction for cost depletion during the period of the payout. MPC contends that it is entitled to a deduction for cost depletion equal to the amount of its cost in the payout. Respondent disagrees with this contention. He claims that the computation of "expected recovery" used by MPC is incorrect because after payout and reversion MPC considered its expected recovery as being 20 percent of the 60 percent working interest income. The expected recovery, it is argued, should have been 60 percent of the working interest income less 80 percent of the net profits to the 60 percent working interest, the distinction being that MPC's expected recovery should include enough gross income to pay 60 percent of the operating costs, not 20 percent of 60 percent of the operating costs. Section 611(a) provides in the*111 case of oil and gas wells: "[There] shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case * * *." In computing cost depletion the adjusted basis of the property as determined under section 1011 is to be used. Section 1012 provides that when property is acquired by purchase, the adjusted basis shall be its cost. Section 1.611-2, Income Tax Regs., provides that the amount of the cost depletion deduction requires that the basis in the property be divided by the estimated number of units of the mineral to be recovered to the owner's interest to obtain a "cost per unit." The deduction for any tax period is then determined by multiplying the "cost per unit" by the number of units produced in the tax period. The same result can be obtained by determining the ratio of cost in dollars to the expected gross income in dollars and then the current deduction is determined by multiplying the current gross income by this ratio. Section 1.614-1(a)(1), Income Tax Regs., provides that "in the case of mines, wells, *112 and other natural deposits, the term 'property' means each separate interest owned by the taxpayer in each mineral deposit in each separate tract or parcel of land." Section 1.614-1(a)(2), Income Tax Regs., provides that the term "interest" means an economic interest in mineral deposits. The term includes "working or operating interests, royalties, overriding royalties, production payments and net profits interests." Section 1.614-2(b) defines the term "operating mineral interest" as meaning "a separate mineral interest as described in section 614(a), in respect of which the costs of production are required to be taken into account by the taxpayer for purposes of computing the limitation of 50 percent of the taxable income from the property in determining the deduction for percentage depletion computed under section 613. * * * The term does not include royalty interests or similar interests, such as production payments or net profits interests." Under these definitions each of the leases assigned to Miles consisted of a separate property. His interest continued over the entire life of each of the properties, even though his interest or percent of profit*113 was diminished. MPC claims that each of the properties purchased was in fact two properties, (1) a production payment until payout, as defined in the farmount agreement, and (2)a working interest after payout. 1419 The facts are that each interest Miles owned (and was purchased by MPC) consisted of an "operating mineral interest" which was subject to a retention of an "80 percent net profits interest." A net profits interest is the same as a royalty. Burton Sutton Oil Co. v. Commissioner, 238 U.S. 25 (1946). Each working interest was at all times subject to this royalty. The fact that the royalty did not produce income to its owners from the beginning of production was caused by the nature of its measurement. By its own terms it was to be paid out of "net profits." The facts were that Miles would not realize any profit from the operations until he had recovered all his cost plus 6 percent interest (a reimbursement of his interest expense or interest on his investment, not a profit on operations). The mechanics of the accounting and timing for the revenues produced and the expenditures incurred in connection with the drilling, equipping and operating costs*114 of each of the properties necessarily delayed any payment to the "royalty"owners until there was in fact a profit. This had not occurred at the time of the sale to MPC. That this "income produced prior to pay out" was not a production payment is further corroborated by the earlier treatment of the income in connection with the development expense incurred to acquire the properties, and by MPC's current treatment of intangible development costs. Miles deducted these expenses on his prior returns as "intangible development costs" and depreciation on equipment. Respondent accepted this treatment as correct. If Miles had had a "production payment,"then these costs would have been capital investments returnable only through depletion. See G.C.M. 22332, 1941-1 C.B. 228. Miles (and subsequently MPC) had at all times an "operating mineral interest" subject to royalties, overriding royalties and an 80 percent net profits interest. Consequently, the depletion computation, based on cost, should be based on the taxpayer's entire cost in the property and the total production expected to be received to his interest. Section 1.611-2(b) and (c), Income Tax Regs. MPC is not entitled*115 to a deduction for cost depletion equal to the amount of its cost in the payout. Applying these principles, the parties can compute, pursuant to Rule 50, the amount of the cost depletion deduction allowable to MPC for its fiscal year ended June 30, 1961. Issue 8. Building Maintenance Expenditures on Rental Property Miles contends that the expenditures were made to put the property back in the condition it was prior to vandalism. Respondent argues that the disallowed expenditures constitute expenses of putting the property in shape for a new tenant and must be capitalized. The expenditures were incurred in December 1962 and January 1963. For a period of approximately six months prior to the expenditures being incurred, the property had been vacant and during that time there was some vandalism in the building. Miles filed a claim with his insurance company for the vandalism and was paid $701.79, which amount was credited to building maintenance and repairs expense in 1963. Prior to the first of the expenditures being incurred, Miles leased most of the building and the adjoining lot to the Skyknight Club, agreeing to fix up the property for use as a club. The Arrow Electric*116 Company performed the electrical work, including general wiring and installing light fixtures. This work was done in part to meet the requirements of the City of Dallas wiring code and in part to meet the requirements of the new tenant. A new glass-lined hot water heater was installed, the property was painted, and an adjoining lot to the building was fixed up for parking for the new tenant by Willie Noble and the Noble Hauling Service. The Carl Doss Construction Company replaced a bannister, worked on the steps, hung new wallpaper, installed shelving and replaced windows. The Barns Lumber Company and Arrow Electric Company statements to Miles indicate that the work performed by them was related to the occupancy of the building by the new tenant. In the alternative, petitioners contend that the life of the improvements to the Maple Avenue property was no longer than the term of the lease to the Skyknight Club, "which at the time was one year" and that at the expiration of the lease the socalled improvements would be obsolete and of no value to Miles. The original lease was actually for a term of one year with two one-year options, and Miles "believed" the tenant "exercised the second*117 year option." Moreover, there is no evidence in this record to support Miles' contention that at the expiration of the lease, whatever the time it covered, the improvements would be obsolete and of no value to him. The expenditures added to the value of the 1420 building. They were capital expenditures. Accordingly, we approve respondent's determination on this issue. Issue 9. Payments to Women In his notice of deficiency to Miles, respondent determined that the amounts of $4,070, $2,800 and $2,169 paid to six women by MPC in the years 1961, 1962 and 1963 constituted dividend income to Miles. It was also determined that payments made by Miles to the women in the years 1961, 1962 and 1963 in the respective amounts of $2,060, $3,000 and $2,603.12 are not deductible by him as busines expenses. Likewise, payments made by MPC to the women in its taxable year ended June 30, 1961, in the total amount of $2,670 are determined not to be deductible by MPC as business expenses. Petitioners contest the determinations, contending that the payments made by Miles and MPC are deductible as ordinary and necessary business expenses and that none of the payments by MPC are dividend income*118 to Miles. Respondent, on the other hand, contends that all the amounts paid the women were "expended for the personal nonbusiness benefit of Ellison Miles." We agree with respondent. We think petitioners have failed to carry their burden of proving that the payments to each of the women were for the performance of secretarial and stenographic services. Thus we conclude that they are not entitled to the deductions claimed and that the amounts paid by MPC are taxable as dividend income to Miles. The amounts paid the women by MPC were charged to office expense and the amounts paid by Miles were charged to general expense. The amounts paid the women were not handled as regular compensation paid to employees. There were no employee compensation schedule forms prepared for these women. There were no withholding or social security taxes deducted from the gross payments made to them, nor did Miles or MPC pay social security taxes thereon. There were no Forms 1099 prepared by MPC with respect to the amounts paid the women in 1960, 1961 or 1962, and in 1963 Forms 1099 were filed only for Betty Simmons, Rubye Greene and Marlene Fowler. Miles never prepared any Forms 1099. The three women*119 who received a substantial portion of the amounts involved, Edna Marie Rushing, Rubye Greene and Marlene Fowler, were not seen to be rendering any services in the Dallas office of MPC and Miles. Betty Simmons and Rubye Greene lived in Houston, Texas. None of the six women testified at the trial as to what services, if any, they might have rendered. Almost all of the checks were in even $100 or $50 amounts. There is a notation on most of the checks or related vouchers reading simply "Secretarial Services" or "Public Stenographer Services." In some instances, however, there are neither cancelled checks nor check vouchers in support of the payments to the women Except for rather vague general statements by Miles that work was done, there was no testimony by the petitioners in regard to the checks issued where there was a notation on the check or the voucher that the services were "Secretarial Services" or "Public Stenographer Services." There are a number of checks which would not be deductible by either Miles or MPC even if it were assumed the notation on the check or voucher represented the services that were rendered. For example, checks were issued to Edna Marie Rushing with*120 notations that services were rendered to "Aviation News, Inc.," which is a separate taxable entity from Miles or MPC in which Miles owns an interest. Miles testified that when anyone other than Aviation News, Inc., paid the salary of Edna Marie Rushing, he paid it, but the record reflects MPC paid Edna Marie Rushing $200 on August 21, 1961. Miles, on the other hand, paid her $200 on May 17, 1963, $250 on July 16, 1963, and $100 on November 6, 1963, where the notation on the check or voucher indicated services rendered for "Aviation News, Inc." Only Aviation News, Inc., might be entitled to deduct these expenditures. Miles issued five checks where the notations thereon indicated the amounts paid related to the Gay-Ninety Club or the work being done on the Maple Avenue property. The Gay-Ninety Club is a separate entity from Miles or MPC. Any bona fide expenditures in connection with the Maple Avenue property would probably have been capital expenditures. Miles issued two checks, one to Edna Marie Rushing dated June 6, 1962, for $250, and a second check to Betty Simmons dated March 30, 1963, for $250, where the notation on the check states that services were rendered to the Civil*121 Air Patrol. This would be a personal expenditure of Miles. He was 1421 personally active in that organization which is unrelated to any of his business activities. We also note that some of the checks and vouchers issued by MPC and Miles have no comment as to what services, if any, may have been rendered. Furthermore, there appears to be no consistency as to whether Miles or MPC paid the women. In short, we regard much of Miles' testimony on this issue as unreliable. In our judgment petitioners have failed to prove that they are entitled to deduct the amounts paid to the women during the years in issue. Accordingly, we sustain respondent's determinations. Issue 10. Claimed General Expense Deductions In his notice of deficiency respondent determined that the amount of $500 paid by MPC to Miles constituted dividend income to Miles. The $500 check of MPC dated December 19, 1961, was made out to cash, cashed by Miles and charged to general expense. There is a notation on the check which reads "Miscl. Xmas Bonuses to part time employees, etc." Although Miles testified that the $500 was given to waitresses, maitre d's, shoeshine boys and other people he came in contact with*122 during the year, the record does not show the names of the persons receiving the money, the amount received by each or the business purpose therefor. They appear to be personal expenses. Petitioner Miles has failed to carry his burden of proof on this item. There is also a failure of proof with respect to a similar item of $250 for the year 1963 claimed by Miles as a business expense. Respondent disallowed deductions to Miles of $300 designated as "office petty cash." Miles testified that three $100 amounts were used as petty cash from which his employees paid postage, delivery boys, and minor office expenses and supplies. The amounts seem reasonable and were paid for business purposes. Consequently, we hold that they were properly deducted as ordinary and necessary business expenses. Issue 11. Claimed Additional Losses of Aviation News In his notice of deficiency to Miles, respondent determined that in the taxable years 1961, 1962 and 1963 Miles had claimed excessive subchapter S corporation losses of Aviation News, Inc., in the respective amounts of $10,984.57, $1,317.17 and $1,577.77. The parties have stipulated that the correct amount of disallowances for the taxable years*123 1961, 1962 and 1963 are $1,482.80, $1,317.17 $1and,577.77, respectively, subject to proof by Miles of additional basis in Aviation News Inc., which would give him an additional deduction for its losses. Miles contends that he made three payments, totaling $550, in 1963 to Edna Marie Rushing. The amount was claimed by Miles as a general expense deduction. We have previously held herein that the amount was not an ordinary and necessary business expense. Miles contends, in the alternative, that the amount should be treated as a loan or advance to Aviation News, Inc., which increased his basis for purpose of determining his share of the losses of Aviation Nes. We conclude that Miles has failed to prove that his share of the loss should be increased by $550. Thus he is not entitled to any additional deductions by reason of losses of Aviation News. Issue 12. Additions to Tax for Negligence This is a factual question. Petitioners assert that they were not negligent and did not intentionally disregard rules and regulations. Respondent claims otherwise and has determined that MPC and Miles are liable for the additions to the tax provided in section 6653(a). The burden of proving that*124 the imposition of these additions are erroneous rests upon petitioners. J.T.S. Brown's Son Co., 10 T.C. 840, 851 (1948); Gibbs & Hudson, Inc. 35 B.T.A. 205, 211 (1936). They have failed to carry their burden of proof. The totality of the evidence with respect to several substantial income items, errors and incomplete and inadequate records convinces us that the imposition of the negligence penalties is justified. Our ultimate finding of fact reflects this conclusion. Accordingly, we hold that at least a part of the underpayment for each year was due to negligence and intentional disregard of rules and regulations, thus rendering MPC and Miles liable for the additions to tax under section 6653(a). To reflect the agreement of the parties on the settled and conceded issues and the conclusions reached herein on the disputed issues, Decisions will be entered under Rule 50. 1422 Footnotes1. All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.↩